[No. S006708. Aug. 17, 1989.]

WESTERN OIL AND GAS ASSOCIATION, Plaintiff and Appellant, v.
MONTEREY BAY UNIFIED AIR POLLUTION CONTROL DISTRICT et al., Defendants and Respondents.

COUNSEL

Philip K. Verleger, Donna R. Black, Michael A. Monahan and McCutchen, Black, Verleger & Shea for Plaintiff and Appellant.

Daniel P. Selmi, Mark I. Weinberger, Shute, Mihaly & Weinberger, Ralph R. Kuchler and W. Allen Bidwell for Defendants and Respondents.

Alan Ramo, Lloyd M. Harmon, Jr., Daniel J. Wallace, Barbara Baird, John K. Van de Kamp, Attorney General, R. H. Connett, Assistant Attorney General, Mary E. Hackenbracht, Deputy Attorney General, Ira Reiner, District Attorney (Los Angeles), Harry B. Sondheim and Patrick D. Moran, Deputy District Attorneys, as Amici Curiae on behalf of Defendants and Respondents.

OPINION

**EAGLESON, J.**—Plaintiff Western States Petroleum Association, a trade association, seeks the invalidation of an air pollution control regulation of defendant Monterey Bay Unified Air Pollution Control District (Monterey District).[1] Although only one district's regulation is directly challenged, this action raises issues of statewide importance to the public health and the future of air pollution control regulation throughout California. The primary legal issue is whether California's Tanner Act (Health & Saf. Code, §§ 39650-39674) prohibits air pollution control districts from regulating nonvehicular emissions of a substance into the air until the State Air Resources Board (board) has identified the substance as a toxic air contaminant and adopted a control measure for it.

We hold that the Tanner Act does not preclude air pollution control districts from regulating emissions of a substance before the board has identified the substance as a toxic air contaminant. This conclusion is man-

---

[1] Plaintiff was named the Western Oil and Gas Association when it filed this action but changed its name to the Western States Petroleum Association after we granted review. To be consistent with the caption of the case in the trial court and Court of Appeal, we retain the association's former name in the caption of our opinion but otherwise use the new name.

dated by well-established principles of statutory construction. Moreover, a contrary conclusion would, for all practical purposes, eliminate nonvehicular air pollution control regulation in this state. Since the Tanner Act's enactment in 1983, the board has identified only nine substances as toxic air contaminants, and many years, perhaps decades, may pass before the board will be able to study, identify, and regulate the hundreds of substances discharged into the air. If board identification and regulation were a prerequisite for district control, nearly all substances would remain unregulated for the foreseeable future. Moreover, in light of this state's lengthy history of air pollution regulation and other environmental protection laws, it is inconceivable, absent clear evidence to the contrary, that the Legislature intended by enacting the Tanner Act to reduce drastically, indeed practically eliminate, such regulation. As we will explain, the purpose of the Tanner Act was to improve air pollution regulation, not to eviscerate it.

The secondary issue is whether the regulation challenged in this case is an improper delegation of authority by the Monterey District to its air pollution control officer. We hold there is no improper delegation.

FACTS

I. *The Tanner Act*

In 1983 the Legislature passed the Tanner Act (Health & Saf. Code, §§ 39650-39674), which established an elaborate process for the board to identify substances as being "toxic air contaminants" and to adopt "airborne toxic control measures" for those contaminants. (Stats. 1983, ch. 1047, § 1, pp. 3691-3702.)[2] The act defines "toxic air contaminant" as "an air pollutant which may cause or contribute to an increase in mortality or an increase in serious illness, or which may pose a present or potential hazard to human health." (§ 39655.)[3] " '[A]irborne toxic control measure' means recommended methods, and where appropriate a range of methods, of reducing the emissions of a toxic air contaminant, including, but not limited to, emission limitations, control technologies, the use of operational and maintenance conditions and closed system engineering." (§ 39656.) The act's regulatory procedure is bifurcated into identification and control processes. Both are lengthy and complex. We will explain them briefly.

---

[2] The act was named for its principal Assembly coauthor, Sally Tanner, 60th Assembly District. (1 Assem. Final Hist. (1983-1984 Reg. Sess.) p. 1131.)

All statutory references are to the Health and Safety Code unless indicated otherwise.

[3] " 'Air contaminant' or 'air pollutant' means any discharge, release, or other propagation into the atmosphere and includes, but is not limited to, smoke, charred paper, dust, soot, grime, carbon, fumes, gases, odors, particulate matter, acids, or any combination thereof." (§ 39013.)

## A. *The identification process*

The board initiates the identification process by requesting the State Department of Health Services (Health Services) to evaluate the health effects of a specific substance that may be a toxic air contaminant and to prepare recommendations regarding the substance. (§ 39660, subd. (a).) Health Services is required to consider "all available scientific data" (§ 39660, subd. (b)) and to estimate the threshold level of exposure that may cause significant adverse health effects or, if there is no threshold level, "the range of risk to humans resulting from current or anticipated exposure." (§ 39660, subd. (c).) Health Services must submit its written evaluation and recommendations to the board no later than 120 days after receiving the board's request for the evaluation. (§ 39660, subd. (d).)[4]

After receiving Health Services' evaluation, the board must prepare "a report in a form which may serve as the basis for regulatory action regarding a particular substance." (§ 39661, subd. (a).) (The act does not specify a time limit within which the board must prepare its report.) The board submits its report and supporting scientific data to a Scientific Review Panel on Toxic Air Contaminants. (§ 39661, subd. (b).) The panel must review the report and supporting data and submit written findings to the board no later than 60 days after receiving the report. (§ 39661, subd. (b).)[5]

Within 10 working days after receiving the scientific review panel's findings, the board must prepare a hearing notice and proposed regulation. (§ 39662, subd. (a).) After the hearing, the board "shall list, by regulation, substances determined to be toxic air contaminants." (§ 39662, subd. (b).) "If a substance is determined to be a toxic air contaminant, the regulation shall specify a threshold exposure level, if any, below which no significant adverse health effects are anticipated." (§ 39662, subd. (c).)

## B. *The control process*

When the identification process is completed, the control process begins with the board preparing "a report on the need and appropriate degree of regulation" for the substance identified as a toxic air contaminant. (§ 39665, subd. (a).) The board must consult with air pollution control districts,

---

[4] Health Services is required to submit its evaluation within 90 days but may petition the board for an extension not to exceed 30 days. (§ 39660, subd. (d).)

[5] The scientific review panel is required to submit its findings within 45 days but may petition the board for an extension not exceeding 15 working days. (§ 39661, subd. (b).)

The panel consists of nine appointed members who "shall be highly qualified and professionally active or engaged in the conduct of scientific research." (§ 39670, subd. (b).)

affected sources, and the interested public in preparing the report, which must address a number of factors, including emission levels, sources, health effects, technology, and costs. (§ 39665, subds. (a) and (b).) After a period for public review and comment and a public hearing, the board must adopt an airborne toxic control measure to reduce emissions of the toxic air contaminant from nonvehicular sources. (§ 39666, subd. (a).)[6]

The board's control measure is a *minimum* standard for regulation by districts throughout the state.[7] Not later than 120 days after the board adopts a control measure, each district in the state must propose its own regulation enacting control measures for nonvehicular sources of that substance. The act states that ". . . a district may, at its option, adopt and enforce *equally effective or more stringent* control measures than the airborne toxic control measures adopted by the state board." (§ 39666, subd. (d), italics added.) Each district must adopt its own regulation not later than six months after the board has adopted its control measure. (§ 39666, subd. (d).)

### C. *Implementation of the act*

The procedures set forth in the act result in the passage of considerable time before the board can adopt a control measure for a particular substance. Aside from the procedures themselves, administrative difficulties have also apparently delayed board proceedings. For example, the board began the identification process for inorganic arsenic by asking Health Services for its evaluation in August 1985. Pursuant to the act (§ 39660, subd. (d)), the evaluation was due in December 1985, but the board did not receive it until February 1988—a delay of more than two years—and numerous steps remain to be taken under the act before the board can identify inorganic arsenic as a toxic air contaminant. Only then can the board begin the process of considering and adopting control measures for the substance. The lengthy nature of proceedings under the act is perhaps best demonstrated by the fact that the board has identified only *nine* substances as toxic air contaminants pursuant to the act, which was enacted six years ago. (Cal. Code Regs., tit. 17, § 93000.)[8]

---

[6] " 'Nonvehicular sources' means all sources of air contaminants, including the loading of fuels into vehicles, except vehicular sources." (§ 39043.)

[7] " 'District' means an air pollution control district or an air quality management district created or continued in existence pursuant to provisions of Part 3 (commencing with Section 40000)." (§ 39025.)

[8] As of March 1989, the nine substances were asbestos, benzene, cadmium, carbon tetrachloride, chlorinated dioxins and dibenzofurans, chromium (VI), ethylene dibromide, ethylene dichloride, and ethylene oxide. This information is contained in a February 1989 report by the board entitled "Status of Toxic Air Contaminant Identification." At Monterey Dis-

## II.  *Rule 1000 of the Monterey District*

In March 1986, the Monterey District adopted Rule 1000, an air pollution control regulation that applies to new or modified stationary emission sources for which an applicant seeks a construction or operation permit. (The rule does not apply to existing sources that are currently operating and not seeking modification of their operations.) Rule 1000 applies to two categories of emissions—"toxic air contaminants" and "carcinogenic toxic air contaminants."

Monterey District's air pollution control officer (control officer) determines whether to designate a substance as being one of the two types of regulated contaminants. A "toxic air contaminant" is defined as a substance: (1) that the control officer concludes "may cause or contribute to a recognizable increase in mortality, morbidity, or may otherwise pose a present or potential material impairment to human health or functional capacity"; and (2) that is listed in state regulations for controlling employee exposure to hazardous substances in the workplace. (Rule 1000, § 3.9.1.) Similarly, the control officer also determines whether to designate a substance as a "carcinogenic toxic air contaminant." His determinations shall be based on consideration of specified scientific data and shall be made in consultation with the state board and Health Services. (Rule 1000, § 3.9.2.) Before the rule was adopted, the control officer designated 23 substances as carcinogenic toxic air contaminants and more than 125 substances as toxic air contaminants. His list was an attachment to Rule 1000 when it was adopted.[9]

Proposed new or modified stationary sources of substances designated as toxic air contaminants under Rule 1000 must install "reasonable control technology" to reduce emissions. Such technology is defined as "the control device or technique which is readily available and is commonly used for similar types of equipment, to control toxic air contaminants." (Rule 1000, § 3.7.1.) If the applicant for a permit demonstrates to the satisfaction of the control officer that such technology is not reasonable, other technology may be allowed. (Rule 1000, § 3.7.2.) For proposed sources of *carcinogenic* toxic air contaminants, Rule 1000 requires installation of the "best control technology" (Rule 1000, § 4.4.1), which is defined as the most effective emission control device or technique successfully used on similar sources and determined by the control officer to be cost effective. (Rule 1000, § 3.1.1.) The

trict's request pursuant to Evidence Code section 452, we take judicial notice of this report. (The association does not oppose the request.)

[9] All the nine substances identified to date by the board as toxic air contaminants are included in Monterey District's list.

permit applicant is allowed an opportunity to demonstrate that the proposed limitations on discharge are not achievable. (Rule 1000, § 3.1.1.)

Rule 1000 also sets maximum exposure limits that sources may not exceed. For toxic air contaminants, the maximums are keyed to "permissible exposure limits" set forth in state regulations for workplace emissions. (Rule 1000, § 4.1.2.)[10] For carcinogenic toxic air contaminants, the maximums are stated in terms of an estimated "net risk" of cancer incidence. (Rule 1000, § 4.4.2.)[11]

### III. *Proceedings in the lower courts*

Shortly after Monterey District adopted Rule 1000, the association filed in the superior court a petition for a writ of mandate and complaint for declaratory relief. The association challenged Rule 1000 on two grounds: (1) that it is in conflict with and is preempted by the Tanner Act, and (2) that the rule improperly delegates authority to Monterey District's control officer. The parties filed cross-motions for summary judgment, and the trial court upheld Rule 1000, entering judgment in favor of Monterey District.

The Court of Appeal reversed, holding that the Tanner Act preempts a district's ability to identify toxic air contaminants and that a district cannot regulate a substance until after the board has identified it as a toxic air contaminant. The court acknowledged that the district had "the unquestionable authority" to adopt Rule 1000 before enactment of the act and that the act does not expressly reserve to the board the authority to identify toxic air contaminants. The court concluded, however, that the act covers the identification process so comprehensively as to indicate that it has become a matter of state, not local, concern. The court reasoned that the Legislature's stated goal of utilizing the best available scientific evidence in identifying substances can be realized only if districts defer regulation until after the board has determined that a substance is a toxic air contaminant. The court also concluded, however, that districts can regulate a substance after it is

---

[10]Rule 1000, section 4.1.2 states, "In no event shall emissions impact of any toxic air contaminant (TAC) in any one hour exceed 1/420th of the current permissible exposure limit (PEL), as defined in Section 3.5, calculated on a worst case basis as measured or calculated beyond the facility property line. . . ." Section 3.5, in turn, provides that the permissible exposure limits specified in state regulations (Cal. Code Regs., tit. 8, § 5155) shall be used unless otherwise specified by the control officer.

[11]Rule 1000, section 4.4.2 states, "Estimated emissions from the subject facility shall not be anticipated to cause a net risk in excess of one cancer incidence per $1 \times 10^5$ population as estimated in a risk assessment . . . ."

identified by the board as a toxic air contaminant, even if the board has not yet adopted a control measure for the substance.[12]

DISCUSSION

I. ▉▉▉ *The Tanner Act Does Not Preclude Air Pollution Control Districts From Regulating Emissions of a Substance Before the Board Has Determined Whether It Is a Toxic Air Contaminant.*

As the Court of Appeal correctly acknowledged, the authority of districts to regulate nonvehicular air pollution was firmly established before the Tanner Act was passed. The act does not expressly rescind the districts' authority or even restrict it, except for the requirement that a district's control measures must be "equally effective or more stringent" than those adopted by the board. (§ 39666, subd. (d).) The association contends, however, that the Legislature's statement of findings and declarations for the act, its legislative history, and the comprehensive procedures created under the act reflect a legislative intent to preempt districts from regulating a substance until the board has identified the substance as a toxic air contaminant and adopted a regulation for it. Because there was clear statutory authority for districts to regulate before the act was passed, we believe it is more accurate to frame the issue as being whether the Legislature intended to repeal by implication the districts' authority. Our decision, however, does not depend on whether the issue is viewed as one of implied repeal rather than preemption.[13]

A. *The districts clearly had authority before the Tanner Act was passed.*

As we explained in rejecting a previous association challenge to an air pollution regulation, there is a lengthy history of district control. (*Western Oil & Gas Assn.* v. *Air Resources Board* (1984) 37 Cal.3d 502, 520-521 [208 Cal.Rptr. 850, 691 P.2d 606] [association challenge to ambient air quality standards adopted by the board].) The Legislature enacted the first California comprehensive air pollution control statutes more than 40 years ago. (Stats. 1947, ch. 632, p. 1640.) Construing the statutory scheme we noted that, "The air pollution control district is *the* agency charged with enforcing

---

[12] Because the Court of Appeal invalidated Rule 1000 on the ground of preemption, the court did not address the association's other contention that the rule is an improper delegation of authority to Monterey District's control officer.

[13] The parties characterized the issue as one of preemption in the lower courts, but Monterey District now states the issue in terms of implied repeal, and the association agrees that our decision should not depend on the characterization of the issue.

both statewide and district emission controls." (*Orange County Air Pollution Control Dist.* v. *Public Util. Com.* (1971) 4 Cal.3d 945, 948 [95 Cal.Rptr. 17, 484 P.2d 1361] [original italics].) We subsequently explained, "This legislation authorized the creation of an air pollution control district in each county and established certain statewide emissions standards. Local authorities, however, were authorized to adopt stricter standards and given the responsibility to enforce both state and local standards." (*Western Oil & Gas Assn.* v. *Air Resources Board, supra,* 37 Cal.3d 502, 520.) In 1967 the Legislature enacted the Mulford-Carrell Air Resources Act, which also provided districts with the primary responsibility for the control of nonvehicular air pollution. (Stats. 1967, ch. 1545, p. 3680; former Health & Saf. Code, § 39102.) The districts' primary authority has been well understood. (See generally Simmons, *A Many Layered Wonder: Nonvehicular Air Pollution Control Law in California* (1974) 26 Hastings L.J. 109, 125; Note, *Stationary Source Air Pollution Control in California: A Proposed Jurisdictional Reorganization* (1979) 26 UCLA L.Rev. 893, 900; Manaster, *Administrative Adjudication of Air Pollution Disputes: The Work of Air Pollution Control District Hearing Boards in California* (1984) 17 U.C. Davis L.Rev. 1117.)

Numerous statutes, in effect when the Tanner Act was adopted, also make clear the districts' authority. Section 39002 states, "Local and regional authorities have *the primary responsibility* for control of air pollution from all sources other than vehicular sources." (Italics added; see also § 40000 [similar language].) Section 39002 provides that ". . . local and regional authorities may establish stricter standards than those set by law or by the state board for nonvehicular sources." (See also § 41508 [similar language].) Section 40001 requires districts to "adopt and enforce rules and regulations which assure that reasonable provision is made to achieve and maintain the state ambient air quality standards for the area under their jurisdiction . . . ." Of particular significance to the present case is section 42300, which states, "Every district board may establish, by regulation, a permit system that requires, except as otherwise provided in Section 42310, that before any person builds, erects, alters, replaces, operates, or uses an article, machine, equipment, or other contrivance which may cause the issuance of air contaminants, such person obtain a permit to do so from the air pollution control officer of the district." Section 42300 expressly authorizes the type of system created by Monterey District's Rule 1000.[14]

---

[14] According to Monterey District, it is the first district in the state to adopt a comprehensive regulation (Rule 1000) that identifies a list of substances that are to be controlled by means of a permit process. The record does not indicate how other districts have exercised their statutory authority under section 42300, but Monterey District has represented that

Districts have long had clear statutory authority to regulate air contaminants, including the power to create permit systems. The question is whether the Legislature intended the Tanner Act to abrogate or restrict this long-standing authority.

B. *There is no basis on which to conclude that the Legislature intended to repeal by implication the districts' authority.*

The Tanner Act does not expressly state that it repeals the districts' prior authority, and we conclude that it does not do so by implication.[15] "[A]ll presumptions are against a repeal by implication." (*Flores* v. *Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 171, 176 [113 Cal.Rptr. 217, 520 P.2d 1033].) The presumption is strong "where the prior act has been generally understood and acted upon." (*Penziner* v. *West American Finance Co.* (1937) 10 Cal.2d 160, 176 [74 P.2d 252]; *Metropolitan Water District* v. *Dorff* (1979) 98 Cal.App.3d 109, 114 [159 Cal.Rptr. 211].) The present statutes (and their predecessors) providing districts with the power to regulate nonvehicular air pollution had been in effect for many years when the Tanner Act was passed, and they had been generally understood and acted upon. (See discussion at pp. 417-419, *ante*.) Furthermore, courts are especially reluctant to find an implied repeal of statutes that serve an important public purpose. (1A Sutherland, Statutory Construction (4th ed. 1985 rev.) § 23.10, p. 346.) The statutes that provide the districts with regulatory authority serve a public purpose of the highest order—protection of the public health.

The presumption against implied repeal is so strong that, "To overcome the presumption the two acts must be irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation. The courts are bound, if possible, to maintain the integrity of both statutes if the two

---

other districts have long imposed conditions on permits on an ad hoc basis. The association does not contend otherwise.

[15] As a preliminary matter, we question whether the districts' authority over nonvehicular sources could be repealed by implication. Section 41508 states, "Except as otherwise *specifically provided in this division* . . . any local or regional authority may establish *additional, stricter standards* than those set forth by law or by the state board for nonvehicular sources." (Italics added.) The Tanner Act is part of the division of the Health and Safety Code (division 26) referred to in section 41508, and the act does not "specifically provide" that districts are prohibited from adopting regulations before the board establishes control measures. Thus, even if the act did implicitly restrict districts' authority, it is questionable whether an implicit restriction would be effective in light of the clear statement in section 41508 that exceptions to the districts' authority must be *"specifically provided."* Because we conclude there was no implied repeal in this case, we need not decide, however, whether a statute can *implicitly* create exceptions to a prior statute that states a rule subject only to *specifically* stated exceptions.

may stand together." (*Penziner* v. *West American Finance Co., supra,* 10 Cal.2d 160, 176.) There must be "*no possibility* of concurrent operation." (*Hays* v. *Wood* (1979) 25 Cal.3d 772, 784 [160 Cal.Rptr. 102, 603 P.2d 19], italics added.) Courts have also noted that implied repeal should not be found unless ". . . the later provision gives *undebatable evidence* of an intent to supersede the earlier . . . ." (*Ibid.*, italics added.) Neither circumstance is present in this case. It is not impossible for the board and the districts to regulate concurrently before the board identifies a substance as a toxic air contaminant and adopts a control measure for it. Nor is there undebatable evidence of a legislative intent to repeal the districts' statutory authority to protect the health of their citizens by controlling air pollution.

### 1. *Concurrent operation*

The association ignores the fact that districts have the primary statutory responsibility to regulate *nonvehicular* sources of emissions. (§ 40000.) The board has responsibility for *vehicular* sources. (§ 40000.) Thus, districts and the board regulate for the most part within different spheres of authority. Moreover, under the Tanner Act there is no direct board regulation of nonvehicular sources. The board only determines whether a substance is a toxic air contaminant and, if so, adopts a control measure, which is implemented by the districts. Because the board does not directly regulate nonvehicular emissions under the act, there is no conflict between the board and districts. Indeed, until the board adopts a control measure, there is no board regulation with which district regulation could conflict.

The only restriction in the act on the districts' authority is the requirement that, after the board has adopted a control measure for a toxic air contaminant, the districts must adopt equally or more stringent measures. Nothing in the act states that a district cannot regulate a substance before the board determines whether it is a toxic air contaminant. When the board does so, the result is that, if a district's regulation is less stringent than the board's, the district will have to tighten its standard. If the district's measure is the same as or more stringent than the board's, the district need do nothing under the act.

The statutes granting districts regulatory authority and the Tanner Act can operate concurrently. We do not find an implied repeal on the basis of a conflict between the prior statutes and the act.

### 2. *Absence of undebatable evidence of intent to repeal*

As noted above, there might be a rare occasion when a court could find an implied repeal on the basis of "*undebatable evidence* of an intent to

supersede the earlier [statute]." (*Hays* v. *Wood, supra,* 25 Cal.3d 772, 784, italics added.) There is no such evidence in this case. The Tanner Act contains 11 detailed, separate "findings and declarations" by the Legislature regarding the need for air pollution regulation and the purpose of the statutory scheme being enacted. (§ 39650, subds. (a)-(k).) Nowhere in this detailed statement did the Legislature indicate any intent to make district control of toxic air contaminants dependent on prior action by the board. To the contrary, the Legislature stated its intent not to restrict district authority. "[T]he purpose of this chapter is to create a program which specifically addresses the evaluation and control of substances which may be toxic air contaminants and *which complements existing authority* to establish, achieve, and maintain ambient air quality standards." (§ 39650, subd. (i), italics added.) In light of the districts' well-established primary responsibility for air pollution (see pp. 417-419, *ante*), it would be unreasonable to conclude that the Legislature intended to *restrict* that authority by declaring a desire to *complement* it. Such interpretation violates both grammatical and common sense.

Nor did the Legislature indicate any desire to forestall meaningful regulation in the interim between the Tanner Act's passage and the board's adoption of control measures. To the contrary, the legislative declarations strongly suggest that a significant delay in regulation would be contrary to the Legislature's purpose. "[I]t is the public policy of the state that emissions of toxic air contaminants should be controlled to levels which prevent harm to the public health." (§ 39650, subd. (c).) "[W]hile absolute and undisputed scientific evidence may not be available to determine the exact nature and extent of risk from toxic air contaminants, it is necessary to take action to protect public health." (§ 39650, subd. (e).) Moreover, the Legislature had previously found that "[T]he people of the State of California have a primary interest in the quality of the physical environment in which they live, and that this physical environment is being degraded by the waste and refuse of civilization polluting the atmosphere, thereby creating a situation which is detrimental to the health, safety, welfare, and sense of well-being of the people of California." (§ 39000.)

We find special significance in section 39650, subdivision (k), which states, "[A] statewide program to control toxic air contaminants is necessary and desirable in order *to provide technical and scientific assistance* to the districts, [and] *to achieve the earliest practicable control* of toxic air contaminants . . . ." (Italics added.) This declaration indicates the Legislature intended the board to assist the districts so they can effectively control air pollution as soon as possible. The legislative declaration does not suggest any intent to eliminate or delay district regulation.

The association construes other portions of the legislative findings and declarations as indicating a desire to preclude districts' control until after board action. For example, the act states "That the identification and regulation of toxic air contaminants should utilize the best available scientific evidence . . . ." (§ 39650, subd. (d).) The association reasons that the act's comprehensive procedures, e.g., the scientific review panel, will allow the board to base its decisions on such evidence but that districts will not have the resources or expertise to obtain and rely on such evidence. Perhaps that is true, but there is no indication in the act that the Legislature intended to preclude district regulation until *after* the board could provide that assistance. It would be unreasonable to conclude that the Legislature wanted absolutely no regulation until the best regulation is possible.

The association also relies on the legislative statement that a statewide program is necessary "to minimize inconsistencies in protecting the public health in various areas of the state." (§ 39650, subd. (k).) The association contends this statement reflects an intent to preclude district regulation because it will result in inconsistencies. This argument ignores the fact that districts are required by the act to adopt "equally effective *or more stringent* control measures" than those adopted by the board. (§ 39666, subd. (d), italics added.) The act expressly sanctions inconsistencies. Every district in the state can have a standard different from the board's control measure and from every other district's standard, as long as the standard exceeds that adopted by the board. The most reasonable construction of the Legislature's reference to avoiding inconsistencies (§ 39650, subd. (k)) is that there must be a consistent *minimum* protection and that the board is to establish that minimum. That requirement does not support the association's conclusion that there can be no district regulation until after the board establishes the statewide minimum.

In short, the legislative statements on which the association relies do not suggest a legislative intent to repeal by implication the districts' authority to regulate nonvehicular emissions. Even if there were such a suggestion, it would not rise to the level of "undebatable evidence," which is required to support a conclusion of repeal by implication. (*Hays* v. *Wood, supra,* 25 Cal.3d 772, 784.) We presume, absent evidence to the contrary, that the Legislature was fully aware of the districts' long-standing statutory authority when the Legislature passed the Tanner Act. The only reasonable conclusion is that if the Legislature had intended to repeal the districts' authority (in whole or in part) the Legislature would have explicitly done so.

C. *The Tanner Act does not impliedly preempt interim district control before board identification and regulation.*

The association contended in the Court of Appeal that the Tanner Act preempts districts' identification and control of toxic air contaminants. Although we believe the issue is better framed as one of implied repeal rather than one of preemption (see p. 417, *ante*), we think it appropriate to address briefly the preemption issue, especially because the Court of Appeal decided the case on that ground. As we will explain, we conclude there is no preemption of interim district control.

■ In *People* ex rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476 [204 Cal.Rptr. 897, 683 P.2d 1150], we rejected a preemption challenge to local regulation of pesticide use and explained that " 'Local legislation in conflict with general law is void. Conflicts exist if the ordinance duplicates [citations], contradicts [citation], or enters an area fully occupied by general law, either expressly or by legislative implication [citations].' " (*Id.*, at p. 484, quoting *Lancaster* v. *Municipal Court* (1972) 6 Cal.3d 805, 806-808 [100 Cal.Rptr. 609, 494 P.2d 681].) The Court of Appeal acknowledged that the Tanner Act does not *expressly* reserve identification of toxic air contaminants to the state. The court concluded, however, that ". . . the area of toxic air contaminant identification is fully occupied *by legislative implication*." (Italics added.) We disagree. ■ "In determining whether the Legislature has preempted by implication to the exclusion of local regulation we must look to the whole purpose and scope of the legislative scheme. There are three tests: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality.' " (*People* ex rel. *Deukmejian* v. *County of Mendocino, supra,* 36 Cal.3d 476, 485, quoting *In re Hubbard* (1964) 62 Cal.2d 119, 128 [41 Cal.Rptr. 393, 396 P.2d 809].)

The Court of Appeal employed the first test and concluded that the identification of toxic air contaminants has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern. The court relied primarily on the detailed and structured procedures established by the Tanner Act for the board to identify toxic air contaminants. The complexity of those procedures, without

more, is an insufficient basis on which to find implied preemption. As we noted in rejecting a similar preemption challenge, "[I]n view of the long tradition of local regulation and the legislatively imposed duty to preserve and protect the public health, preemption may not be lightly found." (*People* ex rel. *Deukmejian* v. *County of Mendocino, supra,* 36 Cal.3d 476, 484.) The comprehensive procedures under the Tanner Act reflect a legislative determination that a thorough study and analysis of potentially harmful substances is necessary to ensure at the earliest possible date a safe minimum level of protection throughout the state. The act does not indicate that less comprehensive procedures cannot be utilized in the interim between the adoption of the act and subsequent board action. Indeed, the comprehensive nature of the act's procedures demonstrate that the Legislature must have been aware there would be a significant delay between the act's passage and board identification of an appreciable number of toxic air contaminants. Because the Legislature provided no procedures for the interim, the most reasonable conclusion is that the Legislature intended districts to continue to have their long-standing authority to regulate until the board could assist them by identifying toxic air contaminants and establishing minimum control measures.

The Court of Appeal also relied on the Legislature's declaration that the board's decisions should be based on the best available scientific evidence and that scientific research should be reviewed by a scientific review panel and members of the public. (§ 39650, subd. (d).) As with the comprehensive nature of the act's procedures, this declaration reflects a legislative intent to ensure effective board regulation in the future. The statement does not suggest any intent to hamstring district control in the meantime.

In short, the identification and regulation of toxic air contaminants are not so fully and completely covered by the act as to indicate that control *before* board identification and regulation has become exclusively a matter of state concern. We hold the Tanner Act was not intended to preempt districts from identifying and regulating toxic air contaminants before the board has done so.[16]

---

[16] Because the Court of Appeal concluded that identification and regulation were fully and completely covered by general law, the court did not decide whether preemption could be found on the grounds that district regulation duplicates or contradicts the Tanner Act. Because the act does not even refer to district regulation before the board identifies and regulates a substance, district regulation before board action clearly does not duplicate the act. Likewise, district control in the interim before board identification and regulation cannot fairly be said to contradict the act's procedures for the board.

Similarly, the other grounds for finding preemption—paramount state concern or adverse effect on transient citizens—are not present in this case. There is no paramount concern that requires prohibition of district regulation until after board action under the Tanner Act. To

D.  *The board's interpretation of the Tanner Act.*

The board, which is the state agency primarily responsible for implementation of the Tanner Act, has consistently interpreted the act as not repealing or preempting districts' preexisting authority to evaluate and regulate emissions from existing and proposed new sources. Indeed, the board has appeared in this action as amicus curiae on behalf of Monterey District. ▇ We stated in rejecting a previous challenge by the association to air pollution regulations that, "As a contemporaneous construction of a statute by an administrative agency charged with its enforcement, the Board's view is entitled to great weight." (*Western Oil & Gas Assn.* v. *Air Resources Board, supra,* 37 Cal.3d 502, 520.) This deference is especially appropriate where the agency's interpretation is congruent with the statute's language and obvious purpose.

E.  *The association's interpretation of the Tanner Act would lead to results contrary to the Legislature's clear purpose.*

As we have explained, the language of the Tanner Act and the statutory framework that had long existed when the act was adopted make clear that the Legislature did not intend to preclude districts from regulating before the board identifies and regulates a substance under the act. If we had some doubt, however, as to the Legislature's intent, the practical effect of the association's view would nonetheless lead us to the same conclusion. ▇ "[W]here the language of a statutory provision is susceptible of two constructions, one of which, in application, will render it reasonable, fair and harmonious with its manifest purpose, and another which would be productive of absurd consequences, the former construction will be adopted." (*Clements* v. *T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 233 [273 P.2d 5].) This principle has been called a " 'golden rule of statutory interpretation.' " (*Armstrong* v. *County of San Mateo* (1983) 146 Cal.App.3d 597, 615 [194 Cal.Rptr. 294], quoting 2A Sutherland, Statutory Construction (4th ed.) § 45.12, p. 37.) Stated differently, "Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) A court should not adopt a statutory construction that will lead to results contrary to the Legislature's apparent purpose.

The association's interpretation of the Tanner Act would lead to such results. As already noted, in the six years since the act was adopted, the

the contrary, the paramount concern is protection of the public health, and that concern is best served if districts can continue to regulate during the interim before board action. Nor is there even an alleged adverse effect on transient citizens.

board has identified only nine substances under the act. From this history it is reasonable to assume that many more years will pass before the board is able to identify and adopt control measures for a significant number of substances. Thus, the practical result of the association's construction of the act would be the absence in the foreseeable future of essentially all nonvehicular air pollution control regulation in California. Stated differently, non-vehicular sources could emit, in the interim, unrestricted amounts of almost all known substances, even those generally believed by the scientific community to pose serious heath risks.[17] In light of the lengthy and relatively complex procedures established by the Tanner Act, the Legislature was surely aware the board would require some time, perhaps a considerable amount, before the board could identify and adopt control measures for an appreciable number of toxic air contaminants. It would therefore be unreasonable to conclude that the Legislature intended to repeal the districts' long-standing power, leaving emissions totally unregulated until the board acts. That drastic result would be contrary to the Legislature's declaration that the Tanner Act was necessary "to achieve the *earliest* practicable control of toxic air contaminants." (§ 39650, subd. (k), italics added; see discussion at p. 421, *ante*.) Moreover, the Legislature's obvious purpose in passing the act was to improve and strengthen air pollution regulation. The result sought by the association would be inimical to that purpose. ■ " '[T]he objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in its interpretation.' " (*Wotton* v. *Bush* (1953) 41 Cal.2d 460, 467 [261 P.2d 256], quoting *Rock Creek etc. Dist.* v. *County of Calaveras* (1946) 29 Cal.2d 7, 9 [172 P.2d 863].) ■ We reject the notion that the Legislature intended to effectively preclude meaningful regulation for the indefinite future. Absent specific and convincing evidence to the contrary, we cannot reasonably conclude the Legislature intended that result.

F.    *Conclusion as to the Tanner Act.*

We hold that the Tanner Act does not preclude air pollution control districts from identifying and regulating emissions of a substance before the board has identified the substance as a toxic air contaminant under the act.[18]

[17] The United States Environmental Protection Agency recently reported at least 2.7 *billion* pounds of chemicals were released into the air in this country in 1987, a volume that the agency called "startling and unacceptably high." (Shabecoff, *Industrial Pollution Called Startling,* L.A. Times (Apr. 13, 1989) pt. D, p. 21, col. 4.) It has also been estimated that, in Los Angeles County alone, industries released 29.7 million pounds of hazardous chemicals into the environment in 1987. (Dolan, *L.A. County Firms Blamed for 40% of Toxic Emissions,* L.A. Times (Apr. 21, 1989) Metro Section, pt. 2, p. 1, col. 1.)

[18] We need not and do not decide the question of whether a district could regulate a substance if the board completed the scientific review process under the Tanner Act and determined that the substance is *not* a toxic air contaminant.

## II. *The Monterey District's Rule 1000 Does Not Improperly Delegate Rulemaking Powers to the District's Control Officer.*

■ The association contends Monterey District's Rule 1000 is invalid under Health and Safety Code sections 40725 through 40728 because the rule grants too much authority to the district's air pollution control officer. The association's argument is somewhat confusing, but the gist of it appears to be that identification by the control officer of a substance as a toxic air contaminant constitutes rulemaking without public notice and hearing and thus violates the statutory requirements for districts' rulemaking.[19] The association's argument ignores the fact that the control officer's list of substances to be regulated was an attachment to Rule 1000 and was available for public comment when the rule was adopted. In other words, the district itself, not the control officer, adopted the list as part of Rule 1000. The association does not contend Monterey District violated any of the statutory rulemaking provisions when it adopted Rule 1000. Thus, there is no basis for the association's argument that the control officer was allowed to engage in rulemaking. He merely assisted in the preparation of an attachment to a rule that the district adopted. ■■ ■■ ■ ■ This assistance did not violate the statutory requirements (§§ 40725-40728) for rulemaking.[20]

If the argument is that the district delegated too much discretion to its control officer before adopting the rule, we reject that argument as well. The association fails to explain why the district could not delegate to its control officer the technical task of preparing the list for the district's adoption. Someone had to do the initial, technical work of identifying the substances that the district subsequently determined should be identified under Rule 1000. Moreover, the control officer's actions before the rule was adopted could not constitute improper rulemaking because the district adopted his

---

[19] Section 40703, subdivision (a) states, "A district board shall not adopt, amend, or repeal any rule or regulation without first holding a public hearing thereon." Related statutes set forth requirements for public notice of the hearing (§ 40725), procedures for the hearing (§ 40726), findings (§ 40727), and recordkeeping (§ 40728).

[20] The association notes in passing (one sentence of a footnote in a brief and a comment at oral argument) that Monterey District has not contended that it complied with the statutory rulemaking requirements when it adopted Rule 1000. The record does not support this assertion. Moreover, it is beside the point. As the party challenging Rule 1000, the association bears the burden of stating and establishing the grounds of its challenge. The district is not required to anticipatorily refute objections to the rule, including the association's objection that the district did not adhere to rulemaking requirements. The association has not met its burden of establishing the district's noncompliance. Most important, the association did not raise this objection in the trial court. A party may not for the first time on appeal change its theory of relief. (*Phillippe* v. *Shapell Industries* (1987) 43 Cal.3d 1247, 1256 [241 Cal.Rptr. 22, 743 P.2d 1279].)

list of substances as part of Rule 1000. ██ "[A]n agency's subsequent approval or ratification of an act delegated to a subordinate validates the act, which becomes the act of the agency itself." (*California Sch. Employees Assn.* v. *Personnel Commission* (1970) 3 Cal.3d 139, 145 [89 Cal.Rptr. 620, 474 P.2d 436].)

██ The association also appears to argue that the *future* identification of additional substances by the control officer would be improper. There seem to be two aspects of this argument. First, such identification would constitute rulemaking without public notice and hearing. Second, the control officer has too much discretion to determine what substances should be identified for future inclusion in Rule 1000. We decline to decide these issues because they are premature. There is no evidence in the record that the control officer has added any substances to the original list adopted as part of Rule 1000. If he does so, the association can then argue that such action constitututes an amendment to the rule (or the adoption of an additional rule) and therefore requires notice and hearing by the Monterey District board under section 40703. We note that Monterey District might choose to obviate such an objection by providing notice and hearing even though Rule 1000 does not expressly require that procedure. Similarly, the district may decide to amend Rule 1000 to provide for notice and hearing to ratify the control officer's addition of substances. Simply put, there is no need for us to decide an issue that may never arise.

The association's contention that the control officer has too much discretion to determine what substances should be added to Rule 1000 is premature for the same reason and may also become moot. If Monterey District ratifies the control officer's addition of substances to the list, the district will have exercised *its* discretion, thus mooting the association's objection. (See discussion at pp. 427-428, *ante.*)

The limited scope of Rule 1000 is an additional reason why we need not address the association's challenge to possible future action by the control officer. The rule applies only to new or modified stationary emission sources for which an applicant is required to seek a construction or operation permit. Thus, the association's challenge is doubly premature: (1) The control officer has not yet added substances to the list; and (2) It is entirely speculative whether a facility that would emit one of the additional substances will ever apply for a permit. If that circumstance arises, and the applicant wishes to challenge the control officer's addition to the list, Rule

1000 provides for an appeal to the Monterey District hearing board. (Rule 1000, § 1.7.1.)[21]

We hold that Rule 1000 and the Monterey District's present list of regulated substances are not an improper delegation of Monterey District's rule-making authority. We do not decide whether a future addition of substances to the list by the control officer would require notice and hearing or whether the control officer's action would need to be ratified by the district.

### CONCLUSION

We find no support in the language or history of the Tanner Act that would support a conclusion that the act precludes districts from identifying and regulating emissions of a substance until after the board has identified and adopted a control measure for the substance. The judgment of the Court of Appeal is reversed.

Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Kaufman, J., and Kennard, J., concurred.

---

[21] The record reflects that the association did not avail itself of this remedy.