Filed 11/14/14  Estate of Gordon CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Estate of KENNETH R. GORDON, Deceased. | B245041 |
| | (Los Angeles County Super. Ct. No. YP011741) |
| ROSE MARIE GORDON, | |
| Petitioner and Appellant, | |
| v. | |
| HOLLY H. REAMER, as Executor, etc. | |
| Objector and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Douglas G. Carnahan, Commissioner.  Affirmed.

Rose Marie Gordon, in pro. per., for Petitioner and Appellant.

Joseph Di Giulio and Howard Posner for Objector and Respondent.

_____

1

## INTRODUCTION

Rose Marie Gordon appeals from an order denying her petition to receive a statutory distribution as an omitted spouse from the estate of her late husband, Ken Gordon.[1] In November 2001, Rose and Ken executed a premarital agreement that contained a mutual waiver of all rights in the other's estate by reason of the proposed marriage. In denying Rose's petition, the trial court made the requisite factual findings for enforcement of the inheritance waiver under the relevant provisions of the Probate Code. The court's findings are supported by substantial evidence. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

Ken and Rose Gordon were married December 1, 2001. Ken was 63 and Rose was 54. Ken had been divorced twice, and Rose was divorced once. Ken was an attorney, Rose was a real estate broker. Ken had a daughter from a previous marriage, who is the prime beneficiary of his will. Rose has a son and a daughter. Seven months before they were married, Rose moved into Ken's Manhattan Beach residence.

On November 28, 2001, three days before their wedding, Ken presented Rose with a premarital agreement while they were running errands for the wedding. They had "chatted" about the agreement before, and Rose understood the agreement was meant to ensure that she kept "what [she] came in with" and Ken kept "what he had."

Paragraph 10 of the agreement, entitled "WAIVER OF RIGHTS IN RESPECTIVE ESTATES," provides for a mutual waiver and relinquishment of all rights "in the other's property, income and estate by reason of the proposed marriage." Rose testified that she did not read paragraph 10 before initialing and signing the agreement, which took only a few minutes. Apart from a provision concerning waiver of spousal support, Ken did not direct her to read anything in the agreement before signing it. Rose thought she should see an attorney before signing the agreement, but decided not to because Ken assured her the agreement could be changed at any time.

---

[1] We refer to Ken and Rose Gordon by their first names for the sake of clarity and not out of disrespect.

2

In Exhibit A to the premarital agreement, Ken disclosed his existing assets, including approximately $500,000 of equity in his Manhattan Beach residence, cash totaling $35,000 in various bank accounts, house furnishings and jewelry valued at approximately $8,000, and a term life insurance policy for $10,000 with no cash surrender value. Ken also disclosed his law practice, a 1984 Corvette, a 1972 Mercedes, a 1976 motor home and two boats made in the mid-1970s, all of which were listed as "value unknown."

Rose disclosed her assets in Exhibit B to the premarital agreement. The list included numerous pieces of furniture and furnishings, signed or numbered art work by Chagall, Mirò and Dali, three sets of Spode dishes, a fox coat, three mink coats, a 1992 Volvo, and her real estate business, all without stated values. The list also included jewelry valued at $31,800, a $70,000 deed of trust on a Redondo Beach property, and a $35,000 certificate of deposit. Rose testified that two other assets listed on Exhibit B—a 401K worth $110,000 and an $250,000 investment plan—were greatly overvalued, and that a life insurance policy listed at $1,000,000 was actually a term policy with no cash value.

According to her trial testimony, Rose was "financially comfortable" when she signed the premarital agreement. She had a successful real estate business, with "some very high-profile clients at that time," and an income of approximately $10,000 per month. Ken reported an annual income of $25,191 on his 2000 taxes and $25,905 on his 2001 taxes.

In accordance with the premarital agreement's terms, Ken and Rose kept their finances largely separate during their marriage. They kept their incomes and bank accounts separate, and they contributed jointly to household expenses. When Rose lent Ken cash, she had him sign for it. In 2009 and 2010, when Rose's business suffered, Ken loaned her money, and Rose documented each advance and kept track of the balance. In 2011, when Rose filed a bankruptcy petition, she alerted her bankruptcy attorney that Ken was not involved in the bankruptcy case because they had a premarital agreement and kept their assets separate.

In January 2012, the executor of Ken's estate petitioned for probate of his will. The will, which Ken executed in June 1983, made no provision for Rose to receive any share of Ken's estate. Rose petitioned for distribution as an omitted spouse pursuant to Probate Code section 21610.

After a hearing, which included testimony by Rose, Ken's daughter, and the executor of Ken's estate, the probate court issued a written decision and order denying Rose's petition.[2] Among other things, the court found Rose was intelligent and sophisticated "in business and legal matters" when she signed the agreement; the agreement was a "standard sort of pre-nuptial agreement between parties who wish to become married, but in many respects wish to live separate lives, especially as regards their financial affairs"; Rose "had, or should have had, an adequate knowledge of [Ken's] obligations and property" when she signed the agreement; Ken and Rose followed the agreement, sometimes accounting to each other for household expenses in "great detail"; during her 2011 bankruptcy, Rose "clearly indicated that she was still aware of [the agreement] [and] intended to rely upon it so as not to have her bankruptcy affect

---

[2] In her briefs, Rose repeatedly refers to a stroke she suffered some months before the hearing to insinuate that the probate court erred by allowing the hearing to go forward. We find no support for this in the record. Though Rose was represented by counsel below, there is no record of a request for continuance of the hearing. Indeed, her stroke was not mentioned until after she completed direct examination and was cross-examined about the records she and Ken kept to divide their expenses. She remarked that "my stroke keeps me from not thinking [*sic*] as quickly as I should[,] [b]ut just bear with me a little bit." The stroke was not mentioned again until the second hearing session a week later, when the probate court asked about it as "a matter of clarifying [its] notes." Rose affirmed that she suffered a stroke roughly five months earlier and told the court she had "a letter from my doctor if you wish to see it." Apparently not wanting to intrude on a private medical matter for which neither Rose nor her counsel had requested accommodation, the probate court responded, "No. That's all right." In its statement of decision, the court accepted Rose's representation about her stroke, and made a factual finding that "Petitioner has recently suffered a stroke, but is not noticeably impaired. She continues to be of sound mind, and is an experienced businesswoman and gave largely credible testimony." We find no error, let alone any prejudice to Rose on this record.

Kenneth's credit"; and "[n]o steps were taken by either [Ken or Rose] to revise or attack" the agreement while Ken was alive.

## DISCUSSION

1. *The Inheritance Waiver Is Governed by the Probate Code*

In this appeal, Rose principally contends the premarital agreement is invalid under former Family Code section 1615, which, at the time the agreement was executed, allowed a party to resist enforcement by proving either "(1) that he or she did not enter into the contract voluntarily, or (2) that the contract was unconscionable when entered into and that he or she did not have actual or constructive knowledge of the assets and obligations of the other party and did not voluntarily waive knowledge of such assets and obligations."[3] (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 15 (*Bonds*).) The estate

---

[3]    In *Bonds,* our Supreme Court held "the circumstance that one of the parties was not represented by independent counsel is only one of several factors that must be considered in determining whether a premarital agreement was entered into voluntarily" under former Family Code section 1615. (*Bonds, supra,* 24 Cal.4th at p. 6.) After the decision, the Legislature responded with amendments to Family Code section 1615. (Stats. 2001, ch. 286, § 2, p. 2317.) Among other matters, the amendments added subdivision (c), which provides that a premarital agreement shall be deemed "not executed voluntarily unless the court finds," inter alia, "(1) The party against whom enforcement is sought was represented by independent legal counsel at the time of signing the agreement or, after being advised to seek independent legal counsel, expressly waived, in a separate writing, representation by independent legal counsel. [¶] (2) The party against whom enforcement is sought had not less than seven calendar days between the time that party was first presented with the agreement and advised to seek independent legal counsel and the time the agreement was signed." (Fam. Code, § 1615, subd. (c)(1) & (2).) Subdivision (c) has no bearing upon the enforceability of the inheritance waiver in this case for two reasons. First, as Rose now apparently recognizes, the amendments adding subdivision (c) did not become effective until January 1, 2002, and these amendments do not apply retroactively to the November 2001 premarital agreement at issue in this case. (Stats. 2001, ch. 286, § 2, pp. 2316-2317; *In re Marriage of Hill & Dittmer* (2011) 202 Cal.App.4th 1046, 1057 [because amendments to Family Code section 1615 "added substantive, not procedural, provisions concerning representation by independent legal counsel," the amendments "did not apply retroactively"].) Second, as we explain here, enforceability of the subject inheritance waiver is governed independently by Probate Code section 140 et seq., even though the

5

responds that Family Code section 1615 does not apply to an inheritance waiver contained in a premarital agreement, as the enforceability of such waivers is independently governed by Probate Code section 140 et seq. This same issue was addressed in *Estate of Will* (2009) 170 Cal.App.4th 902, and resolved in favor of enforcement under the Probate Code. We agree with *Estate of Will*, and adopt its reasoning in this case.

For context, we begin with an overview of the relevant Probate Code provisions.[4] Under section 21610, if a decedent fails to provide by will for the decedent's surviving spouse who married the decedent after the execution of the will, the omitted spouse shall receive a prescribed share of the decedent's estate. Section 21611, subdivision (c) provides that this right can be waived by "a valid agreement waiving the right to share in the decedent's estate." Sections 140 through 147 concern a surviving spouse's waiver of inheritance rights. Section 147, subdivision (c) provides for enforcement of such a waiver "by a person intending to marry."

Section 142, subdivision (a) requires a waiver of inheritance rights to be in writing and signed by the surviving spouse. Subdivision (b) states a waiver also must comply with the enforceability requirements of "either Section 143 or Section 144."[5] (§ 142,

___

waiver is included in a premarital agreement that is otherwise governed by Family Code section 1615. (See *Estate of Will* (2009) 170 Cal.App.4th 902, 908.)

[4]    Future statutory references are to the Probate Code unless otherwise indicated.

[5]    Section 143 provides an inheritance waiver is enforceable unless the surviving spouse proves (1) A fair and reasonable disclosure of the property or financial obligations of the decedent was not provided to the surviving spouse prior to the signing, unless the surviving spouse waived disclosure after advice by independent legal counsel; or (2) the surviving spouse was not represented by independent legal counsel at the time of signing of the waiver. Because it is undisputed that Rose was not represented by independent counsel, the probate court correctly concluded the waiver could be enforced only if it met the requirements of section 144. (See Cal. Law Revision Com. com., Deering's Ann. Prob. Code (2004 ed.) foll. § 144, p. 75 ["Under subdivision (a), a waiver that is not enforceable pursuant to Section 143 may be enforceable if it is shown that the waiver at the time of execution made a fair and reasonable disposition of the rights of the surviving spouse or the surviving spouse had, or reasonably should have had, an adequate

subd. (b).)  As we discuss *post*, the probate court determined the subject inheritance waiver met the requirements of section 144, which states a waiver is enforceable if the probate court determines either (1) that the waiver at the time of signing made a fair and reasonable disposition of the rights of the surviving spouse; or (2) that the surviving spouse had, or reasonably should have had, adequate knowledge of the decedent's property and the decedent did not violate any fiduciary duty to the surviving spouse. Under section 144, the probate court also has discretion to refuse or limit enforcement of the waiver if, after considering all relevant facts and circumstances, it finds enforcement would be unconscionable under the circumstances.  (§ 144, subd. (b).)

In *Estate of Will*, the court considered whether an inheritance waiver that met the requirements of section 142, but which was contained in a premarital agreement that would be deemed involuntarily executed under Family Code section 1615, could nevertheless be enforced against an omitted spouse in a probate proceeding.[6]  Beginning with the "presumption against a repeal by implication," the *Estate of Will* court concluded that the more recently enacted provisions of Family Code section 1615 did not override the Probate Code provisions regarding inheritance waivers.  (*Estate of Will, supra,* 170 Cal.App.4th at p. 907.)  The court explained:  "In enacting Family Code section 1615, the Legislature did not mention Probate Code section 140 et seq. regarding premarital inheritance waivers by surviving spouses.  This omission implies that the Legislature intended that omitted spouse waivers continue to be governed independently

---

knowledge of the property and the financial obligations of the other spouse"]; see also § 142 [a waiver is enforceable if it is in writing, signed by the surviving spouse, and meets the requirements of "either Section 143 or Section 144"].)

[6]    In *Estate of Will*, the decedent and his omitted wife executed a premarital agreement one day before they were married.  (*Estate of Will, supra,* 170 Cal.App.4th at pp. 905-906.)  Because the omitted wife executed the agreement less than seven days after it was presented to her and without representation by independent counsel, the agreement would have been deemed "not executed voluntarily" under Family Code section 1615 as the statute existed in 2003 when the agreement was executed.  (See fn. 3, *ante*.)

7

by the Probate Code. Moreover, the two statutory schemes are not so inconsistent or irreconcilable that they cannot have concurrent operation. [Citation.] Each scheme primarily concerns fair and reasonable disclosure of property at the time the premarital agreement or inheritance waiver was executed. The statutory framework of the Family Code and the Probate Code concerning inheritance waivers seeks to safeguard the rights of surviving spouses by similar disclosures and protections." (*Estate of Will,* at p. 908.)

Like the *Estate of Will* court, we too are mindful of the presumption against a repeal by implication. As our Supreme Court explained, "[t]he presumption against implied repeal is so strong that, '[t]o overcome the presumption the two acts must be irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation. The courts are bound, if possible, to maintain the integrity of both statutes if the two may stand together.' " (*Western Oil & Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 419-420.) Here, the two acts, each of which "seeks to safeguard the rights of surviving spouses by similar disclosures and protections" (*Estate of Will, supra,* 170 Cal.App.4th at p. 908), can plainly stand together. Had the enforceability of the premarital agreement arisen in the context of a marital dissolution proceeding, clearly the Family Code would govern. However, because the enforceability of an inheritance waiver will arise only in a probate proceeding, and can be assessed independently from other provisions of the premarital agreement in that context, we agree with *Estate of Will* that it is appropriate to evaluate the waiver's enforceability under the Probate Code. Accordingly, we reject Rose's contention that the Family Code governs in this case.

2.     *The Inheritance Waiver Is Enforceable Under Section 144*

We turn now to the lower court's findings under the Probate Code. As noted, the probate court determined the subject inheritance waiver was enforceable under both prongs of section 144, finding the waiver made a fair and reasonable disposition of the parties' assets (§ 144, subd. (a)(1)), and that Rose had adequate knowledge of Ken's finances when the agreement was signed (§ 144, subd. (a)(2)). The court also found the

8

agreement was not unconscionable at inception or the time of enforcement. (See § 142, subd. (a); § 144, subd. (b).)

"The rules of evidence, the weight to be accorded to the evidence, and the province of a reviewing court, are the same in a will contest as in any other civil case. [Citations.] . . . 'In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the [trial court]. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' " (*Estate of Bristol* (1943) 23 Cal.2d 221, 223.)

Substantial evidence supports the probate court's findings under section 144. First, with respect to whether the waiver made a fair and reasonable disposition of the parties' rights (§ 144, subd. (a)(1)), the evidence shows the waiver was mutual in both form and substance when it was signed. As Rose testified, she was "financially comfortable" when the parties executed the waiver in 2001. She had a successful real estate business and an income of approximately $10,000 per month, while Ken's tax returns showed an annual income of only $25,191 in 2000 and $25,905 in 2001. The parties' mutual waiver of all rights and interests in the other's estate did not result in Ken retaining all the couples' combined wealth on his side of the transaction. On the contrary, the evidence suggests Rose potentially had more to protect when the waiver was signed.

9

The evidence also supports the probate court's finding that Rose had, or reasonably should have had, adequate knowledge of Ken's property and financial obligations when she executed the agreement.  (§ 144, subd. (a)(2).)  In Exhibit A to the premarital agreement, Ken disclosed his existing assets, while cautioning that the values listed were "mere estimates only," "done without the benefit of an audit."  Testimony by the executor for the estate confirmed that Exhibit A disclosed Ken's two largest assets—a personal residence in Manhattan Beach and a 20-foot Skipjack boat.  For her part, Rose, who lived with Ken for seven months before signing the agreement and 10 years thereafter, did not testify or present any evidence to suggest that Ken failed to disclose any assets on Exhibit A.  Rather, Rose acknowledged her late husband was "a great, great man" who "always kept his promises to me."

At trial, Rose's counsel did argue that Exhibit A "understated" Ken's assets by listing certain items, such as Ken's law practice and the boats, with "[v]alue unknown." The probate court rejected this contention, stating "[t]he court cannot find these assertions to be true."  On appeal, Rose has failed to identify anything in the record that compels a different conclusion.  The disclosure in Exhibit A, coupled with Rose's time living with Ken and the sincere relationship they apparently shared, supports the court's finding that she had, or reasonably should have had, adequate knowledge of Ken's assets when she executed the waiver.

Finally, the court concluded the waiver was not unconscionable. On appeal, Rose argues the evidence compelled a finding of procedural unconscionability, based on the timing and circumstances under which Ken presented her with the waiver.[7] Procedural unconscionability includes "(1) 'oppression,' which refers to an inequality of bargaining power resulting in no real negotiation and the absence of meaningful choice; and (2) 'surprise,' which occurs when 'the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms.' " (*Dean Witter Reynolds, Inc. v. Superior Court* (1989) 211 Cal.App.3d 758, 767 (*Dean Witter Reynolds*).) Rose contends both oppression and surprise were established, insofar as Ken was a family law attorney with expertise in this area and he presented her with the premarital agreement only three days before they were to be wed. The probate court rejected these contentions. Its findings are supported by substantial evidence.

On the issue of oppression, the court acknowledged Ken was a family law attorney, but it found "[b]oth parties were of sound mind and were not unsophisticated." In that regard, the court cited evidence that Rose "was an experienced real estate professional" and "savvy" enough to consider consulting with independent counsel, though she ultimately "declined to do so." This evidence is sufficient to support the court's finding that, despite Ken's greater familiarity with premarital agreements, the

---

[7] Rose's argument is directed at unconscionability in the inception of the agreement (see § 142, subd. (c)), and does not challenge the probate court's finding that enforcing the waiver would not be unconscionable under the present circumstances (§ 144, subd. (b)). In any event, the court's finding concerning unconscionability in the enforcement is supported by substantial evidence. As the court noted in its statement of decision, the evidence established that Rose knew about the agreement, largely abided by its terms, and even invoked it in connection with her bankruptcy. Though the court acknowledged Rose had suffered some health and financial troubles since the agreement was executed, it found she remained "an experienced businesswoman" "of sound mind," and there were not extraordinary changed circumstances that would warrant voiding the agreement. (See Cal. Law Revision Com. com., Deering's Ann. Prob. Code (2004 ed.) foll. § 144, p. 75 [emphasizing that "safety valve" from unconscionable enforcement provided by subdivision (b) "is not intended to apply in any but the extraordinary case"].)

parties' bargaining power was not so unequal as to prevent Rose from making a meaningful choice about the inheritance waiver.

As for surprise, the court found the premarital agreement was "not particularly prolix and the elements of its waiver language stand out from the text in obvious ways." We reach the same conclusion on our independent review of the agreement. Further, although the probate court accepted Rose's testimony that she had not seen the agreement prior to signing it, the court also emphasized her testimony concerning discussions with Ken about the agreement "as long as a few months before the wedding." Notwithstanding the impending wedding date, this evidence is sufficient to support the court's finding concerning the absence of procedural unconscionability.[8]

---

[8]    Additionally, as the *Dean Witter Reynolds* court explained, the concept of unconscionability has both a procedural and substantive element, and "both procedural and substantive unconscionability must be present before a contract will be held unenforceable." (*Dean Witter Reynolds, supra,* 211 Cal.App.3d at p. 768.) " 'Substantive' unconscionability consists of an allocation of risks or costs which is overly harsh or one-sided and is not justified by the circumstances in which the contract was made." (*Ibid.*)  Here, the probate court found the inheritance waiver was not substantively unconscionable for the same reasons cited with respect to section 144, subdivision (a)(1)—that is, the mutual waiver made a fair and reasonable disposition of the parties' rights and obligations when signed.  As discussed with regard to section 144, this finding is supported by substantial evidence.  Thus, even if procedural unconscionability had been established, without a finding of substantive unconscionability, we still would not deem the waiver unenforceable. (*Dean Witter Reynolds,* at p. 768.)

## DISPOSITION

The order is affirmed.  Respondent is entitled to her costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.

ALDRICH, J.