[No. B226105. Second Dist., Div. Five. Oct. 27, 2011.]

SOUTHERN CALIFORNIA GAS COMPANY, Plaintiff and Appellant, v. SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT et al., Defendants and Respondents.

252

254

## COUNSEL

Latham & Watkins, Robert A. Wyman, Michael G. Romey and Megan E. Lorenz for Plaintiff and Appellant.

Kurt R. Wiese, Barbara Baird, William B. Wong, Lauren B. Nevitt; Daniel P. Selmi; Miles Chen Law Group and Patricia J. Chen for Defendants and Respondents.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Assistant Attorney General, Helen G. Arens and Kavita P. Lesser, Deputy Attorneys General, as Amici Curiae on behalf of Defendants and Respondents.

Thomas E. Montgomery, County Counsel (San Diego), Paula Forbis, Deputy County Counsel; Kathy Pittard; Dennis Marshall, County Counsel (Santa Barbara), William M. Dillon, Deputy County Counsel; and Raymond A. Biering for San Diego County Air Pollution Control District, Sacramento Metropolitan Air Quality Management District, Santa Barbara County Air Pollution Control District and San Luis Obispo County Air Pollution Control District as Amici Curiae on behalf of Defendants and Respondents.

OPINION

TURNER, P. J.—

## I. INTRODUCTION

Plaintiff, Southern California Gas Company, appeals from the denial of its mandate and prohibition petition and declaratory relief complaint. Plaintiff filed suit against defendants, South Coast Air Quality Management District (the district) and the Governing Board of the South Coast Air Quality Management District (the board). Plaintiff unsuccessfully challenged the district's rule No. 433 (Rule 433) which imposes monitoring, recordkeeping and reporting requirements on it. We conclude the trial court correctly denied plaintiff's petition and complaint.

## II. MANDATE AND PROHIBITION PETITION AND DECLARATORY RELIEF COMPLAINT

Before proceeding to a discussion of the petition and complaint, we note many of the theories therein are not raised on appeal. For completeness purposes, though, we set forth the plaintiff's allegations in their entirety. Filed August 4, 2009, the petition and complaint alleges plaintiff operates the nation's largest natural gas distribution facility; distributes gas and provides service to over 20 million customers; and is a network that encompasses over 20,000 square miles across 12 counties and nine local air pollution and quality management districts. Emissions of nitrogen oxides from "stationary sources' combustion of natural gas in Southern California" account for only 5 percent of all such discharges in the South Coast Air Basin (the basin). Fourteen percent of the natural gas in plaintiff's system comes from wells in California and offshore. Eighty-six percent of the gas comes from producers in Canada, the southwestern United States and the Rocky Mountains. Plaintiff's commercial customers directly purchase natural gas from these out-of-state producers. Plaintiff's pipelines are used to convey the gas to local commercial customers who have purchased it directly from out-of-state producers. Approximately 60 percent of the gas flowing through plaintiff's pipelines is owned by its customers. Different natural gas supplies have varying chemical compositions and performance characteristics. It is essential that different supplies be interchangeable without adversely affecting operational safety and efficiency or materially increasing air pollution.

Public Utilities Code section 451 requires plaintiff to provide gas services at just and reasonable prices. California's Public Utilities Commission comprehensively regulates plaintiff's operations. This regulatory regime requires plaintiff to charge just and reasonable prices and maintain facilities within its geographical service area. The Public Utilities Commission also requires uniform pricing throughout its service area for the same units of energy. This comprehensive regulation includes tariff rule No. 30, which governs the chemical composition and performance characteristics of natural gas in plaintiff's gas lines.

Further, the Public Utilities Commission's tariff specifications require the natural gas in plaintiff's system be interchangeable. One interchangeability measure is the Wobbe Index or Wobbe Number reading which is based on the heating value and specific gravity of the gas. Stated more basically, the Wobbe Index is the measure of the density of the heating volume· for a given natural gas amount. In September 2006, the Public Utilities Commission revised plaintiff's tariff rule No. 30. The 2006 revision required that non-California supplies of natural gas have a maximum Wobbe Index reading of 1385. The Public Utilities Commission considered the necessity of diversifying gas sources; the need to set a relatively high Wobbe Index standard; and the fact that increased gas supplies will result in lower costs to natural gas and electricity consumers. During the lengthy two-year proceedings leading up to the September 2006 Public Utilities Commission decision, the district had advocated the adoption of a maximum Wobbe Index reading of 1360 and that additional testing be conducted. The Public Utilities Commission rejected the district's proposed Wobbe Index figure and the need for future testing. The Public Utilities Commission found that imposing a different Wobbe Index figure in the district's jurisdiction was infeasible. The district filed a mandate petition in the Court of Appeal seeking to set aside tariff rule No. 30, which was denied. The district's review petition filed in the Supreme Court was denied on July 16, 2008.

In 2007, while the Public Utilities Commission proceedings were pending, the district unilaterally proposed setting a Wobbe Index reading of 1360. The district proposed a control measure, designated as CMB-04, which consisted of two components. According to the petition: " 'The first component will include monitoring and testing of natural gas supplies to enhance quantification of emission changes attributable to gas quality higher than a Wobbe Index of 1360.' The second component, which is to follow the first, will impose a [Wobbe Index] of 1360 'or equivalent mechanism/parameter.' It will also include unspecified 'mitigation measures.' " The document describing CMB-04 admitted that it may be necessary to seek additional legislation in order to implement the proposed control measure. The district adopted its 2007 Air Quality Management Program, which included CMB-04.

After CMB-04 was adopted, the district staff recommended adoption of Rule 433. Rule 433 was designed to monitor changes in the quality of natural gas and air pollutant levels. Rule 433 was to apply to all operators that convey natural gas to end users in the district. Plaintiff is the only entity in the district subject to the requirements of Rule 433. Only one other entity in the district is subject to any of Rule 433's requirements. Pursuant to Rule 433, plaintiff is required to monitor and report to the district the Wobbe Index readings in numerous locations; educate end users concerning gas quality changes; recommend revisions to end user equipment maintenance programs; determine if there are quality changes in gas derived from liquefied natural gas in selected end user equipment; and prepare an annual estimate of emissions due to liquefied natural gas or other new supplies of natural gas. Plaintiffs' initial startup costs of complying with Rule 433 will be between $1.4 and $3.2 million. There will be additional ongoing costs of $250,000 per year. Further, imposition of the Wobbe Index reading of 1360 and restraints by the district's current out-of-state and new natural gas supplies would increase plaintiff's customers' costs. On April 10 and June 4, 2009, plaintiff submitted written objections to the adoption of Rule 433. On June 5, 2009, the board, acting purportedly pursuant to Health and Safety Code section 41511, adopted Rule 433.

Based on these factual allegations, plaintiff alleges six causes of action. The first cause of action seeks a writ of mandate. The first cause of action alleges defendants exceeded their authority under the Health and Safety Code; by acting in excess of their jurisdiction, that they committed a prejudicial abuse of discretion; and plaintiff has no adequate remedy at law. The second cause of action alleges the Public Utilities Commission has authority over natural gas public utilities; the 2006 decision adopting a Wobbe Index reading of 1385 has the force of law; Rule 433 is intended to enforce a different Wobbe Index reading of 1360; and in setting a lower Wobbe Index reading than that established by the Public Utilities Commission, defendants acted in contravention of their authority under law. The third cause of action seeks issuance of a writ of mandate because defendants violated Health and Safety Code section 40727. According to plaintiff, Health and Safety Code section 40727 requires the board make specified findings before adopting a rule. In making findings that lacked any evidentiary support, the board acted in an arbitrary and capricious manner. The fourth cause of action sought issuance of a writ of mandate based on an alleged commerce clause violation. (U.S. Const., art. I, § 8, cl. 3.) The fifth cause of action seeks issuance of a writ of prohibition based on all of the theories in the first four causes of action. The sixth cause of action for declaratory relief is not before us as it was dismissed pursuant to stipulation after the trial court denied plaintiff's request for issuance of a writ of mandate and prohibition.

The prayer for relief is as the follows: "That this [c]ourt issue a writ of mandate commanding [defendants] to set aside and not enforce Rule 433; [¶] . . . That this [c]ourt issue a writ of prohibition arresting their unlawful proceedings; [¶] . . . That this [c]ourt declare that [defendants] are without authority to regulate [plaintiff's] distribution of natural gas into the South Coast Air Basin, including specifying the [Wobbe Index] of the natural gas or 'an equivalent mechanism/parameter'; [¶] . . . That this [c]ourt award [plaintiff] its costs and reasonable attorneys' fees; [¶] . . . That this [c]ourt grant such other relief as it finds just and proper."

## III. THE FACTS

### A. The Public Utilities Commission and Federal Energy Regulatory Commission Proceedings

In January 2004, the Public Utilities Commission instituted a rulemaking proceeding that addressed, in part, the potential introduction of gas derived from liquefied natural gas into California. Among the issues addressed during the rulemaking proceeding was whether gas quality tariff specifications for natural gas transported by plaintiff should be revised. The reason for the potential revision was the anticipated introduction of gas derived from liquefied natural gas into California. One of the issues resolved was whether the Wobbe Index reading should be revised for gas derived from liquefied natural gas transported by plaintiff. The district argued during the rulemaking proceeding the combustion of gas derived from liquefied natural gas would result in increased nitrogen oxides emissions. The district argued during the rulemaking proceeding the Wobbe Index for liquefied natural gas entering the basin should be a range between 1332, plus or minus 2 percent, and a maximum reading of 1360. In addition, the district requested the Public Utilities Commission order plaintiff to conduct further investigation of the air emission impacts of Wobbe Index reading changes.

In September 2006, the Public Utilities Commission rejected the district's position that the Wobbe Index maximum reading be set at 1360. The California Public Utilities Commission concluded a Wobbe Index reading of 1360 would "unnecessarily constrain" this state's natural gas supplies; the district's proposal to require that plaintiff apply a different Wobbe Index reading in the basin was infeasible; and increasing the use of gas derived from liquefied natural gas would benefit the environment by displacing the use of less environmentally friendly fuels. Also, the Public Utilities Commission rejected the proposal of several parties, including plaintiff, that an upper Wobbe Index reading of 1400 be established. The Public Utilities Commission established an upper Wobbe Index reading of 1385 for plaintiff and San Diego Gas & Electric Company. The Public Utilities Commission

also rejected the district's request that plaintiff be ordered to conduct further testing. The Public Utilities Commission reasoned that other entities were carrying out "extensive studies" and urged "all stakeholders to participate" in further collaborative testing.

In addition, the district attempted to impose Wobbe Index reading limitations on plaintiff's operations in an interstate pipeline certificate proceeding before the Federal Energy Regulatory Commission. The Federal Energy Regulatory Commission refused to deviate from the decision of the Public Utilities Commission. The Ninth Circuit Court of Appeals affirmed the decision of the Federal Energy Regulatory Commission. (*South Coast Air Quality Management Dist. v. FERC* (9th Cir. 2010) 621 F.3d 1085, 1094–1101.)

## B. Board Proceedings

In 2007, the district's 2007 Air Quality Management Plan included a control measure denominated CMB-04 (Natural Gas Specifications). CMB-04 was developed in anticipation of the opening of the Energia Costa Azul regasification terminal located in Ensenada in Baja California and the introduction of gas derived from liquefied natural gas into California. CMB-04 requires the district to work with "stakeholders" to "assess emission impacts based on the data collected" and to conduct additional studies "to further refine emission factors" by equipment type. In 2009, prior to the public release of the then proposed Rule 433, district staff met with plaintiff's employees. Plaintiff's representatives extensively commented and asserted the district had no authority to regulate natural gas under the Health and Safety Code. On June 5, 2009, the board adopted Rule 433. The district's counsel argued Health and Safety Code section 41511, which granted the board the authority to regulate air pollution emission sources, authorized the adoption of Rule 433.

Rule 433 applies to all operators of natural gas distribution systems. But plaintiff is the only entity that is subject to all of Rule 433's requirements. Plaintiff is one of only two entities that are subject to any of its provisions. Rule 433 implements the first component of control measure CMB-04. The first component of CMB-04 requires the monitoring of natural gas supplies to quantify emission changes attributable to a Wobbe Index reading of greater than 1360. While CMB-04 contemplates potential future actions to mitigate emission increases, Rule 433 is limited to monitoring and data gathering. The information collected pursuant to Rule 433 would allow the district to determine the extent of increases in nitrogen oxides emissions from the combustion of higher Wobbe Index natural gas. We will describe the requirements imposed by Rule 433 in detail later in this opinion. (See, *post*, at pp. 271–274.)

## C. Administrative Record

Natural gas is a component of the district's clean air strategy. Many of the district's rules effectively mandate the use of natural gas as a clean energy source. The predominate fuel used by stationary sources in the district is natural gas. Stationary sources burn very little coal and oil in the district. Less than 15 percent of the natural gas used in the district is produced in California. The chemical composition of these traditional sources of natural gas is relatively stable. Natural gas is composed primarily of methane. But there are additional components of natural gas other than methane which affect its heating value. Higher concentrations of hydrocarbons such `as ethane, propane, and butane increase the heating value of the gas. But inert compounds such as carbon dioxide and nitrogen decrease natural gas's heating value.

The district staff described the Wobbe Index: "The Wobbe Index . . . is one of the most important characteristics of natural gas in terms of natural gas interchangeability and its effect on air pollutant emissions." The Wobbe Index readings of domestic natural gas supplies materially vary depending on the place of origin. But the quality of the natural gas historically consumed in the district has been very stable. Based on data provided by plaintiff, Wobbe Index readings vary between only 1319 and 1353 which is less than plus or minus 0.9 percent.

Imported liquefied natural gas has a different chemical composition than the traditional sources of natural gas consumed in the district. Imported liquefied natural gas is cooled and condensed into liquid for shipment to the United States. As a result of this condensing process and differing international standards and markets, natural gas derived from liquefied natural gas has significantly higher hydrocarbon levels. Additionally, liquefied natural gas possesses lower levels of inert compounds. As a result, liquefied natural gas has a much higher Wobbe Index reading than traditional natural gas. As noted previously, between 2000 and 2004, the natural gas Wobbe Index readings in the district were between 1319 and 1353. Indonesian liquefied natural gas has a Wobbe Index reading of 1412. Australian liquefied natural gas has a Wobbe Index reading of about 1426. Malaysian liquefied natural gas has a Wobbe Index reading of 1414. In May 2008, a study was conducted by the San Diego County Air Pollution Control District (the San Diego district). The San Diego district study indicates that traditional sources of natural gas have a Wobbe Index reading of 1340. By contrast, the Wobbe Index reading for gas derived from liquefied natural gas is near 1385.

Before liquefied natural gas is useable, it must be "regasified." The first liquefied natural gas terminal on the West Coast, the Energia Costa Azul

regasification terminal located 14 miles north of Ensenada in Baja California, is now operational. The liquefied natural gas received at the Energia Costa Azul regasification terminal will enter California at Blythe and Otay Mesa near San Diego. The Blythe pipeline receiving point, which includes domestic natural gas from El Paso, can direct up to 1.2 billion cubic feet per day of natural gas into Southern California. The administrative record is unclear as to how much natural gas derived from liquefied natural gas will be shipped through the Blythe receiving point. The administrative record states a "much greater" amount of the natural gas flowing from the Blythe receiving point will be from domestic sources. (The domestic natural gas will have a lower Wobbe Index reading than that derived from liquefied natural gas regasified at the Energia Costa Azul facility.) Yet, the administrative record also states the Energia Costa Azul facility, which will ship natural gas derived from liquefied natural gas, has a one billion cubic feet per day capacity. And 11 other liquefied natural gas terminals have been proposed for West Coast development. Four offshore liquefied natural gas terminals have been proposed. One liquefied natural gas terminal is proposed to be built in Long Beach Harbor.

Energia Costa Azul is owned by Sempra LNG, a subsidiary of Sempra Energy. Sempra Energy has contracted for the purchase of liquefied natural gas from Tangguh, Indonesia. Royal Dutch Shell leases 50 percent of the Energia Costa Azul liquefied natural gas capacity. Royal Dutch Shell has contracted to purchase liquefied natural gas from Russia. Sempra Energy is also plaintiff's parent company.

Concern over the increases in liquefied-natural-gas-related nitrogen oxides emissions is universally shared by the district; the San Diego district; the California Air Resources Board; and the federal Environmental Protection Agency. Studies conducted by industry groups, air districts and plaintiff indicate that burning gas with a higher Wobbe Index reading will increase nitrogen oxides emissions. Gas derived from liquefied natural gas has a higher Wobbe Index reading and thus burns at higher temperatures. Plaintiff's consultant, Charles Benson of ENVIRON International Corp. indicates, as combustion temperatures are higher, there is an exponential increase in the formation of nitrogen oxides emissions. A study prepared by ENVIRON International Corp., which was funded by plaintiff, calculated the difference in nitrogen oxide output if the Wobbe Index reading increased from 1360 to 1385. According to the ENVIRON International Corp. analysis, if current equipment is used, liquefied natural gas use could increase the district's nitrogen oxides emissions by 124.1 tons per year. The San Diego district analyzed the effects of a one-day influx of liquefied natural gas in that county. The analysis was conducted on several pieces of equipment. The San Diego district study found that the liquefied natural gas influx could trigger increases in nitrogen oxides emissions of up to 10 percent.

Such an increase could affect the district's ability to accurately quantify its emissions inventory. Further, the studies highlight that hotter burning gas may negatively affect the performance of a wide variety of combustion equipment. Among the types of combustion equipment that may be affected are appliances, reciprocating engines, combustion turbines, industrial boilers, furnaces and heaters. Hotter burning natural gas can result in an increase in emissions from combustion. Hotter burning gas can lead to noncompliance with emission requirements in industrial boilers, furnaces and heaters. Most natural-gas-fueled equipment located in the district does not have a system to continuously monitor emissions output. Thus, combustion of gas derived from liquefied natural gas potentially may violate limits in air pollution permits without the equipment operator's knowledge. Other studies assert there is a need for additional information to more precisely quantify nitrogen oxides emission increases. Uncertainty remains in the scientific data about the emission impacts of combusting liquefied-natural-gas-derived natural gas.

The district is legally obligated to account for its emissions inventory in its air quality management plan. Thus, if information concerning potential increases in the inventory of nitrogen oxides emissions is incomplete, the district is obligated to engage in further data gathering and monitoring. The federal Environmental Protection Agency has determined that the district is not meeting federal particulate matter standards. These standards apply to particulate matter less than 2.5 micrometers in diameter and are referred to as $PM_{2.5}$. (40 C.F.R. § 81.305 (2011); U.S. Envtl. Protection Agency, Technology Transfer Network, National Ambient Air Quality Standards ($PM_{2.5}$) $PM_{2.5}$ NAAQS Impplementation <http://www.epa.gov/ttnnaaqs/pm/pm25_index.html> [as of Oct. 27, 2011].) Similarly, the district is not meeting California's ozone standards. (Cal. Code Regs., tit. 17, § 60201.) $PM_{2.5}$ and ozone cause serious adverse public health effects. (71 Fed.Reg. 61144, 61152 (Oct. 17, 2006);[1] 69 Fed.Reg. 23858, 23859 (Apr. 30,

---

[1] 71 *Federal Register* 61144, 61152 (Oct. 17, 2006) *while referring to a prior summary of adverse health impacts of* $PM_{2.5}$ *states:* "The information highlighted there summarizes: [¶] (1) Multiple biologic mechanisms that may be responsible for morbidity/mortality effects associated·with exposure to ambient fine particles, including potential mechanisms or pathways related to direct effects on the respiratory system, systemic effects that are secondary to effects in the respiratory system including cardiovascular effects, or direct cardiovascular effects. [¶] (2) The nature of the effects that have been reported to be associated with fine particle exposures including premature mortality, aggravation of respiratory and cardiovascular disease (as indicated by increased hospital admissions and emergency department visits), changes in lung function and increased respiratory symptoms, as well as new evidence for more subtle indicators of cardiovascular health. [¶] (3) An integrated evaluation of·the health effects evidence, with emphasis on key issues raised in interpreting epidemiological studies, along with supporting evidence from experimental (e.g., dosimetric and toxicologic) studies. [¶] (4) Sensitive or vulnerable subpopulations that appear to be at greater risk to such effects, including individuals with pre-existing heart and lung diseases, older adults, and children. [¶]

2004).[2]) By 2015, the district must demonstrate compliance with an enhanced federal $PM_{2.5}$ standard. By 2024, the district is obligated to meet a new federal eight-hour ozone standard. This is a more stringent requirement than the former federal one-hour ozone standard.

Nitrogen oxides contribute to the formation of both ozone and $PM_{2.5}$. Nitrogen oxide is an ozone precursor. Nitrogen oxides react with volatile organic compounds in the atmosphere to form ozone. And nitrogen oxides react with other pollutants to form secondary $PM_{2.5}$. The district staff conducted nitrogen oxides modeling studies. The studies determined the necessary reductions in the basin's nitrogen oxides emissions that must be attained in order to meet the new 2015 and 2024 $PM_{2.5}$ and ozone standards respectively. To meet the new federal $PM_{2.5}$ standards by 2015, the district must achieve a reduction of 192 tons of nitrogen oxides emissions per day. In order to meet the new federal 8-hour ozone standards by 2024, the district must reduce its nitrogen oxides emissions by 383 tons per day. Overall, the district must achieve by 2024 a 78 percent reduction in nitrogen oxides emissions beyond that in current rules to meet the new federal ozone and $PM_{2.5}$ requirements.

## IV. THE TRIAL COURT'S RULING

The trial court denied the mandate and prohibition petition. The trial court ruled, "[Plaintiff] is the operator of a natural gas distribution system which can be regulated because the natural gas it distributes is a source which can lead to the discharge of air emissions produced when the end-user burns the natural gas." The trial court relied in part on Health and Safety Code section 40000 et seq., which provides that regional authorities, such as defendants, have the primary responsibility for control of air pollution from all sources

(5) Conclusions, based on the magnitude of these subpopulations and risks identified in health studies, that exposure to ambient fine particles can have substantial public health impacts."

[2] 69 Federal Register 23858, 23859 (Apr. 30, 2004) states: "Ozone is a significant health concern, particularly for children and people with asthma and other respiratory diseases. Ozone has also been associated with increased hospitalizations and emergency room visits for respiratory causes, school absences, and reduced activity and productivity because people are suffering from ozone-related respiratory symptoms. [¶] Breathing ozone can trigger a variety of health problems. Ozone can irritate the respiratory system, causing coughing, throat irritation, an uncomfortable sensation in the chest, and/or pain when breathing deeply. Ozone can worsen asthma and possibly other respiratory diseases, such as bronchitis and emphysema. When ozone levels are high, more people with asthma have attacks that require a doctor's attention or the use of additional medication. Ozone can reduce lung function and make it more difficult to breathe deeply, and breathing may become more rapid and shallow than normal, thereby limiting a person's normal activity. In addition, breathing ozone can inflame and damage the lining of the lungs, which may lead to permanent changes in lung tissue, irreversible reductions in lung function, and a lower quality of life if the inflammation occurs repeatedly over a long time period (months, years, a lifetime)."

other than motor vehicle emissions. The trial court interpreted the phrase "all sources" as evidence of the Legislature's intent to allow regional authorities such as defendants to control air pollution from anything "that leads to a discharge" into the air. Also, the trial court relied on Health and Safety Code section 40716, subdivision (a)(1) which grants the district the power to reduce or mitigate indirect or areawide air pollution emissions. Finally, the trial court concluded: "In sum, section 41511 permits the [d]istrict to adopt rules and regulations that apply to the owner or operator of air pollution emissions. [Plaintiff] owns and operates the pipeline system that delivers natural gas to customers, but does not own most of the gas it delivers. The [d]istrict does not claim for purposes of adopting Rule 433 that [plaintiff's] pipeline system, which it does own, is a 'an air pollution emissions source.' However, [plaintiff] is the operator of a natural gas distribution system which can be regulated because the natural gas it distributes is a source which can lead to the discharge of air emissions produced when the end-user burns the natural gas. Sections 39043 and 41511 permit the [d]istrict to require an owner or operator of a natural gas distribution system to take reasonable actions for the determination of emissions from natural gas as a source of air pollution emissions. [¶] The [d]istrict did not act in excess of its jurisdiction in promulgating Rule 433." (Fn. omitted.)

## V. DISCUSSION

### A. Standards of Review

Defendant's adoption of Rule 433 is a quasi-legislative act. Our Supreme Court has explained: "[Q]uasi-legislative rules . . . represent[] an authentic form of substantive lawmaking: Within its jurisdiction, the agency has been delegated the Legislature's lawmaking power. [Citations.] Because agencies granted such substantive rulemaking power are truly 'making law,' their quasi-legislative rules have the dignity of statutes." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; see *Y.K.A. Industries, Inc. v. Redevelopment Agency of City of San Jose* (2009) 174 Cal.App.4th 339, 359, fn. 22 [94 Cal.Rptr.3d 424] ["Quasi-legislative acts . . . are the formulation of a rule to be applied to future cases . . . ."].) We apply the following deferential standard of review to an agency's quasi-legislative decisions: " ' "[I]n reviewing the legality of a regulation adopted pursuant to a delegation of legislative power, the judicial function is limited to determining whether the regulation (1) is 'within the scope of the authority conferred' [citation] and (2) is 'reasonably necessary to effectuate the purpose of the statute' [citation]." [Citation.] "These issues do not present a matter for the independent judgment of an appellate tribunal; rather, both come to this court freighted with [a] strong presumption of regularity . . . ." [Citation.] Our inquiry necessarily is confined to the question

whether the classification is "arbitrary, capricious or [without] reasonable or rational basis." [Citations.]' " (*Yamaha Corp. of America v. State Bd. of Equalization, supra*, 19 Cal.4th at p. 11, citing *Wallace Berrie & Co. v. State Bd. of Equalization* (1985) 40 Cal.3d 60, 65 [219 Cal.Rptr. 142, 707 P.2d 204].) Of all administrative decisions, quasi-legislative acts receive the most deferential level of judicial scrutiny. (*Khan v. Los Angeles City Employees' Retirement System* (2010) 187 Cal.App.4th 98, 106 [113 Cal.Rptr.3d 417]; *Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75 Cal.App.4th 1315, 1331 [90 Cal.Rptr.2d 54].) Further, if an administrative agency has consistently interpreted statutory language over time, its long-standing analysis is entitled to greater deference. (*Yamaha Corp. of America v. State Bd. of Equalization, supra*, 19 Cal.4th at p. 13; *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 801 [85 Cal.Rptr.2d 844, 978 P.2d 2].) And, our Supreme Court has described the authority granted to the district as serving the highest public purposes, "The statutes that provide the districts with regulatory authority serve a public purpose of the highest order—protection of the public health." (*Western Oil & Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 419 [261 Cal.Rptr. 384, 777 P.2d 157].) **(2)** Civil statutes enacted to protect the public are generally broadly or liberally applied in favor of that protective purpose. (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 537 [120 Cal.Rptr.3d 531, 246 P.3d 612]; *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 313 [58 Cal.Rptr.2d 855, 926 P.2d 1042].)

But we conduct independent review of whether defendants have exceeded the scope of authority delegated by the Legislature to them or the meaning of a statute. (*Yamaha Corp. of America v, State Bd. of Equalization, supra*, 19 Cal.4th at pp. 11–12 & fn. 4; *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1389 [241 Cal.Rptr. 67, 743 P.2d 1323].) Deference is not accorded to an administrative action which is incorrect in light of unambiguous statutory language or which is clearly erroneous or unauthorized. (*Bonnell v. Medical Board* (2003) 31 Cal.4th 1255, 1265 [8 Cal.Rptr.3d 532, 82 P.3d 740]; *People ex rel. Lungren v. Superior Court, supra*, 14 Cal.4th at p. 309.) Nor can we, in construing a remedial statute liberally, apply it in a manner not reasonably supported by its statutory language. (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 645 [88 Cal.Rptr.3d 859, 200 P.3d 295].)

## B. The District's Rulemaking Authority

The federal Clean Air Act (42 U.S.C. § 7401 et seq.) requires each state to adopt a state implementation plan. The state implementation plan must contain enforceable emissions limits; other control measures, means and techniques that will meet federal ambient air quality standards in each state's

air basins; and appropriate devices, methods, systems and procedures necessary to monitor, compile, and analyze ambient air quality data. (42 U.S.C. § 7410(a)(2)(A)[3]; 40 C.F.R. § 51.112 (2011).) Failure to meet federal air quality attainment standards can result in the imposition of sanctions including the loss of transportation project funding. (42 U.S.C. §§ 7410(m), 7509(b).)

■ California in turn requires the district to plan for and attain federal and state ambient air quality standards in the basin. (Health & Saf. Code, §§ 40402, subd. (e), 40460, subd. (a), 40913.) The Legislature has designated regional air pollution districts as the primary enforcers of air quality regulations. (*Western Oil & Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist., supra,* 49 Cal.3d at pp. 418–419 [" '[A]ir pollution control district is *the* agency charged with enforcing both statewide and district emission controls. . . .' "]; *Western Oil & Gas Assn. v. Air Resources Board* (1984) 37 Cal.3d 502, 523 [208 Cal.Rptr. 850, 691 P.2d 606] ["[T]he Legislature has traditionally viewed local and regional authorities as the primary enforcers of air quality regulations throughout the state. . . ."].) The district's primary duty is the control of air pollution from all sources other than motor vehicle emissions. (Health & Saf. Code, §§ 39002, 40000.)[4] The district is expressly mandated to ensure "new sources of emissions" are operated in a manner consistent with the basin's air quality goals and set "stringent emission standards" for nonvehicular sources. (Health & Saf. Code, § 40402, subds. (e), (g).) The Legislature has mandated that the district adopt and *implement* a comprehensive basinwide air quality management plan. (Health & Saf. Code, § 40402, subd. (e).)[5] In preparing an attainment plan, the district is charged by the Legislature with reviewing the "full spectrum of emission

---

[3] Title 42 United States Code section 7410(a)(2) states: "Each implementation plan submitted by a State under this chapter shall be adopted by the State after reasonable notice and public hearing. Each such plan shall—[¶] (A) include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this Act; [¶] (B) provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to—[¶] (i) monitor, compile, and analyze data on ambient air quality, and [¶] (ii) upon request, make such data available to the Administrator . . . ."

[4] Health and Safety Code section 39002 states in part: "Local and regional authorities have the primary responsibility for control of air pollution from all sources other than vehicular sources. The control of vehicular sources, except as otherwise provided in this division, shall be the responsibility of the State Air Resources Board. Except as otherwise provided in this division, including, but not limited to, Sections 41809, 41810, and 41904, local and regional authorities may establish stricter standards than those set by law or by the state board for nonvehicular sources." Health and Safety Code section 40000 states in part, "The Legislature finds and declares that local and regional authorities have the primary responsibility for control of air pollution from all sources, other than emissions from motor vehicles."

[5] Health and Safety Code section 40402, subdivision (e) states, "That, in order to achieve and maintain air quality within the ambient air quality standards, a comprehensive basinwide

sources"; focusing particular attention on "areawide emission sources"; achieving the most efficient methods of air pollution control; and placing priority on achieving expeditious progress toward the goal of healthful air. (Health & Saf. Code, § 40910.)[6]

█ The district from time to time revises its air quality management plan. In pursuit of these legislatively mandated duties, the district is authorized to adopt rules. Health and Safety Code section 40001, subdivision (a) states in part, "[T]he districts shall adopt and enforce rules and regulations to achieve and maintain the state and federal ambient air quality standards in all areas affected by emission sources under their jurisdiction, and shall enforce all applicable provisions of state and federal law." Among the powers granted by statute to the district is to adopt rules which are necessary or proper to fulfill its duties. (Health & Saf. Code, § 40702.)[7] As with the preparation of the air quality management plan, the district is charged with considering the "full spectrum" of emission sources in promulgating regulations. (Health & Saf. Code, § 40910.)

Further, the district is empowered by the Legislature to require an operator of a pollution source to disclose data concerning emissions. The district may require an operator of any source to disclose data necessary for estimating air pollution emissions: "A district shall have power: [¶] . . . [¶] (g) To require any owner or operator of any air pollution emission source, except a noncommercial vehicular source, to provide (1) a description of the source, and (2) disclosure of the data necessary to estimate the emissions of pollutants for which ambient air quality standards have been adopted, or their precursor pollutants, so that the full spectrum of emission sources can be addressed equitably pursuant to Section 40910." (Health & Saf. Code,

---

air quality management plan must be developed and implemented to provide for the rapid abatement of existing emission levels to levels which will result in the achievement and maintenance of the state and federal ambient air quality standards and to ensure that new sources of emissions are planned and operated so as to be consistent with the basin's air quality goals."

[6] Health and Safety Code section 40910 states in part: "It is the intent of the Legislature in enacting this chapter that districts shall endeavor to achieve and maintain state ambient air quality standards for ozone, carbon monoxide, sulfur dioxide, and nitrogen dioxide by the earliest practicable date. In developing attainment plans and regulations to achieve this objective, districts shall consider the full spectrum of emission sources and focus particular attention on reducing the emissions from transportation and areawide emission sources. Districts shall also consider the cost-effectiveness of their air quality programs, rules, regulations, and enforcement practices in addition to other relevant factors, and shall strive to achieve the most efficient methods of air pollution control. However, priority shall be placed upon expeditious progress toward the goal of healthful air."

[7] Health and Safety Code section 40702 states in part, "A district shall adopt rules and regulations and do such acts as may be necessary or proper to execute the powers and duties granted to, and imposed upon, the district by this division and other statutory provisions."

§ 40701.) As noted previously, Health and Safety Code section 40910 obligates the district maintain state ambient air quality standards for "ozone, carbon monoxide, sulfur dioxide, and nitrogen dioxide" by the earliest feasible date. Health and Safety Code section 40910 requires the district "consider the full spectrum of emission sources" and focus specific concentration on reducing the emissions from transportation and areawide emission sources. And the district powers extend to taking reasonable actions to determine the amount of emissions from a source: "For the purpose of carrying out the duties imposed upon . . . any district, the . . . district . . . may adopt rules and regulations to require the owner or the operator of any air pollution emission source to take such action as the . . . the district may determine to be reasonable for the determination of the amount of such emission from such source." (Health & Saf. Code, § 41511.)

### C. Rule 433

#### 1. Overview

■ Rule 433 requires plaintiff to report, describe and disclose data concerning Wobbe Index readings resulting from the use of gas derived from liquefied natural gas. The stated purposes of Rule 433 are, "The purposes of this rule are to monitor changes, if any, to the quality of natural gas being supplied to end users located within the South Coast Air Quality Management District (District), and determine air pollutant emission changes." (Rule 433(a).)

#### 2. Monitoring plan

■ Rule 433(d) requires plaintiff to develop a gas quality monitoring plan: "All operators shall submit to the Executive Officer for written approval and shall implement a Gas Quality Monitoring . . . Plan. The objectives of the [gas quality monitoring plan] are to monitor: 1) the quantity and [Wobbe Index] of natural gas in high-pressure transmission pipelines entering the District; and 2) the [Wobbe Index] of natural gas in each Btu District." Rule 433(c)(6) defines the Wobbe Index, "The [Wobbe Index] of natural gas is the higher heating value . . . of the natural gas, expressed as Btu per standard cubic foot, divided by the square root of the gas' real relative density . . . ." A Btu district is defined in Rule 433(c)(1): "A B[tu district] is a geographic area defined by the operator of a natural gas distribution system for the purpose of determining the heating value of natural gas and natural gas bills for natural gas customers within that area."

The gas quality monitoring plan must specify locations where the Wobbe Index readings will be monitored; the analytical methods to be used in

calculating the Wobbe Index readings; the methodology and frequency of the Wobbe Index readings determinations at each location; the locations of high-pressure transmission pipelines in the district; 11 locations where the quantity of natural gas delivered by high-pressure pipelines to end users will be calculated; missing data procedures; and maps of and any planned changes to Btu districts. (Rule 433(d)(1)(A)–(I).) Rule 433(d)(2) specifies the process to be followed if plaintiff amends its gas quality monitoring plan. Rule 433(d)(3) requires plaintiff's gas quality monitoring plan to provide historical data concerning the Wobbe Index and other readings over a three-year period. Plaintiff must submit to the district a summary of the daily average of *three* readings between January 1, 2006, through December 31, 2008, if they are available. The averages of the *three* readings are to be calculated for each Btu district.

■ The first reading is the higher heating value of natural gas in each Btu district. (Rule 433(d)(3).) (This is also known as the gross heating value.) The higher heating value is the amount of heat released by the complete combustion of fuels with air under specified circumstances. (Rule 433(c)(6).) The second reading that must be reported is available data concerning the relative density of the natural gas in each Btu district. (Rule 433(d)(3).) The relative density of natural gas is measured in pounds per square cubic foot. (Rule 433(c)(6).) The third reading plaintiff is required to report is the Wobbe Index levels during the reporting period. (Rule 433(d)(3).)

### 3. Rollout plan

■ Rule 433(d)(4) requires plaintiff to submit a liquefied natural gas rollout plan to the district's executive officer. The rollout plan must include past measures and future planned actions to educate natural gas end-users about gas quality changes and "recommend revisions to selected end-user equipment maintenance or tuning practices"; past actions and future planned measures to determine the effects of gas quality changes from liquefied natural gas-derived "natural gas on emissions from selected end-user combustion equipment within the" district; and subject to specified exceptions, the results, if any, "of emission testing conducted prior to plan submittal" by plaintiff or one of its contractors at an end-user or test facility. (Rule 433(d)(4)(A)–(C).) This latter reporting requirement relates to testing done to determine changes in gas quality and any effects resulting from liquefied natural gas use. This latter reporting obligation requires plaintiff to identify the equipment used in the test; test date; sampling and measurement methods; natural gas Wobbe Index readings; test conditions; and emission results. In addition, Rule 433(d)(4)(C) states, "The operator shall indicate whether the test was conducted to determine baseline emissions prior to changes in [the Wobbe Index reading], if any, from a delivery of [liquefied natural gas]-derived natural gas into the operator's distribution system, or after changes in

[the Wobbe Index reading] due to a delivery of [liquefied natural gas]-derived natural gas into the operator's distribution system, or neither." In the event testing occurred before or after repairs, plaintiff must describe them along with the emission results. (Rule 433(d)(4)(C).)

### 4. Compliance requirements

Rule 433(e) sets forth the following compliance requirements: by September 1, 2009, plaintiff must submit historical data concerning the higher heating value, relative density of the natural gas, and the Wobbe Index readings for each Btu district to the district's executive officer; by December 1, 2009, plaintiff must secure approval of the initial gas quality monitoring and liquefied natural gas plans; within 30 days the district executive's approval, plaintiff must implement the gas quality monitoring and liquefied natural gas plans; and by September 1, 2010, and annually thereafter, plaintiff must submit an estimate of the emission changes resulting from the use of gas derived from liquefied natural gas to the district's executive officer. (Rule 433(e)(1)(A)–(E).) In terms of the initial annual report which was to be filed by September 1, 2010, the relevant time period would be from the implementation of the gas quality monitoring plan until June 30, 2010. (Rule 433(e)(1)(E).) The district's executive officer is barred from unreasonably disapproving plaintiff's gas quality monitoring and liquefied natural gas plans or any amendments thereto. (Rule 433(e)(2).)

### 5. Monitoring, recordkeeping and reporting requirements

Rule 433(f) imposes monitoring, recordkeeping and reporting requirements on plaintiff. These requirements are subject to the discretion of the district's executive officer or as set forth in plaintiff's approved gas quality monitoring and liquefied natural gas plans. Rule 433(f)(1) through (6) imposes the following monitoring, recordkeeping and reporting requirements. First, the district is required to determine and record hourly the higher heating value, Wobbe Index and relative gas density readings at each high pressure pipeline entering the district. Further, plaintiff is required to record in decatherms the quantity of natural gas flowing at each of the high-pressure pipelines entering the district. (Rule 433(f)(1)(A).) Plaintiff is only required to accomplish these monitoring and recordkeeping tasks at 11 locations where natural gas enters the district. (Rule 433(f)(1)(B).) Or the monitoring and recording tasks can be done at locations representative of high-pressure pipelines entering the district. And the foregoing monitoring, recordkeeping and reporting is to occur only to the extent the information is available. (Rule 433(f)(1).) The recorded monthly data is to be transmitted by e-mail using a specified file format no later than 60 days after the conclusion of the reporting period. (Rule 433(f)(3).)

██ Second, in each Btu district, plaintiff is required to monitor and record the monthly average higher heating value, Wobbe Index and relative gas density readings. Or, plaintiff may monitor and record the higher heating value, Wobbe Index and relative gas density averages over a period consistent with Public Utilities Commission-approved billing practices. (Rule 433(f)(2).) The same reporting protocol applicable under Rule 433(f)(1) applies to Btu district data. (Rule 433(f)(3).) Third, in the event of a breakdown in the monitoring or communication equipment in specified scenarios, plaintiff is required to identify and explain the reasons for any missing data. (Rule 433(f)(4).)

██ Fourth, plaintiff is required to report on a quarterly basis the data derived from the liquefied natural gas rollout plan. (Rule 433(d)(4), (f)(5).) Each report must include the following: "Results of all emission tests on end-user equipment, including the equipment description (type of equipment, make, model, rated thermal input), the date of the test, sampling and measurement methods, the natural gas [Wobbe Index reading], and test conditions. The operator shall identify whether a test was conducted to determine baseline emissions prior to changes in [the Wobbe Index reading], if any, from a delivery of [liquefied natural gas]-derived natural gas into the operator's distribution system . . . . If the operator conducts emissions tests before and after any repairs, adjustments or tuning of the equipment, the operator shall report all emission tests and what repairs, adjustments or tuning was conducted . . . ." (Rule 433(f)(5)(A).) ██ Further, plaintiff is required to identify guidance, service or technologies offered to end users to reduce or eliminate emission increases caused by liquefied natural gas-derived natural gas. (Rule 433(f)(5)(B).)

██ Fifth as noted, plaintiff must submit an annual report detailing emission data due to the use of liquefied natural and other new gasses. (Rule 433(d)(6).) As part of that annual report, plaintiff must submit data concerning changes to emissions resulting from changes in natural gas quality. The annual report is to be submitted by September 1 of each year. (Rule 433(f)(6).)

### 6. Other requirements

██ Rule 433(g) specifies technical monitoring requirements. Rule 433(h) specifies operators who are exempt from its reporting and monitoring requirements. Rule 433(h)(1) states, "Any operator whose only sources of natural gas are through the receipt of natural gas monitored by another operator or operators pursuant to this rule is exempt from this rule." Also, an operator who does not receive liquefied natural gas from a supplier is exempt from the reporting requirements in Rule 433(d)(4) through (6).

### D. The Adoption of Rule 433 Was Not Arbitrary, Capricious or Without Reasonable or Rational Basis.

 Rule 433 requires plaintiff to implement gas quality monitoring and liquefied natural gas plans which include data reporting and monitoring of specified emission levels. Health and Safety Code section 40001, subdivision (a) expressly authorizes the district to adopt rules designed to maintain air quality. Plaintiff does not dispute defendants possess rulemaking authority. And these statutory rulemaking powers extend to taking actions which are "necessary or proper" to execute the district's extensive air pollution duties. (Health & Saf. Code, § 40702.) Finally, Health and Safety Code section 41511 vests the district with the discretion to adopt rules it deems reasonable. Plaintiff makes no serious argument that the district cannot require monitoring and data disclosure of pollution sources.

 All plaintiff argues is *the natural gas* it owns or is transported through its pipeline is not a pollutant source within the meaning of Health and Safety Code section 41511. As a corollary of this assertion, plaintiff argues it is not an emission source. Plaintiff cites to the language in Health and Safety Code section 41511 that vests the district to adopt reasonable rules "to require the owner or the operator of any air pollution emission *source*" to determine the amount of pollutants it produces. (Italics added.) Plaintiff relies on Health and Safety Code section 39043 which defines "non-vehicular" sources: " 'Nonvehicular sources' means all sources of air contaminants, including the loading of fuels into vehicles, except vehicular sources." And plaintiff relies on Health and Safety Code section 39013 which defines "air containment" thusly: ' "Air contaminant' or 'air pollutant' means any discharge, release, or other propagation into the atmosphere and includes, but is not limited to, smoke, charred paper, dust, soot, grime, carbon, fumes, gases, odors, particulate matter, acids, or any combination thereof." Initially, we note the definitional language in Health and Safety Code sections 39013 and 39043 does not purport to limit the district's power to require plaintiff report pollutant levels. Further, plaintiff cites to no committee reports or other evidence of legislative intent concerning the adoption of Health and Safety Code sections 39013 and 39043. There is no evidence that the Legislature intended that Health and Safety Code sections 39013 and 39043 restrict reasonable data monitoring and reporting.

Defendants could reasonably find that plaintiff's pipeline and natural gas derived from liquefied natural gas are a potential pollutant source. The administrative record demonstrates natural gas owned by plaintiff or carried in its pipelines will be imported from overseas. As previously noted, natural gas derived from liquefied natural gas produces significantly higher hydrocarbon levels. It also produces lower levels of inert compounds than that

currently imported into the district. The average Wobbe Index reading using nonliquefied natural gas in the district has been between 1319 and 1353. By contrast, natural gas derived from Indonesian liquefied natural gas produces a Wobbe Index reading of 1412. Natural gas derived from Malaysian liquefied natural gas produces a Wobbe Index reading of 1414. Australian liquefied natural gas produces a Wobbe Index reading of 1426. The higher the Wobbe Index reading, the greater the temperature at which gas derived from liquefied natural gas burns. There is widespread governmental and industry recognition that use of liquefied natural gas will lead to increased nitrogen oxides emissions. Plaintiff's own consultants have admitted the use of gas derived from liquefied natural gas with a Wobbe Index reading of 1385 could increase the district's nitrogen oxides emissions by 124.1 tons per year. The San Diego district study indicates the use of gas derived from liquefied natural gas will increase nitrogen oxides emission by 10 percent. Nitrogen oxides contribute to the formation of both ozone and $PM_{2.5}$. The gas derived from liquefied natural gas is introduced into the district by plaintiff in its pipelines. The gas derived from liquefied natural gas is converted at Energia Costa Azul which is owned by Sempra LNG, a subsidiary of Sempra Energy. Sempra Energy is plaintiff's parent company. Thus, gas derived from liquefied natural gas, with its possible deleterious environmental impacts, is regasified at the Energia Costa Azul facility. As noted, the Energia Costa Azul facility is *owned* by Sempra LNG, a subsidiary of Sempra Energy. One of Sempra Energy's subsidiaries, Sempra LNG, *owns* a facility from which another, plaintiff, receives potentially environmentally detrimental natural gas derived from liquefied natural gas. This natural gas derived from liquefied natural gas is consequently introduced into the district. Defendants could reasonably find the gas derived from liquefied natural gas owned by plaintiff or shipped in its pipelines is a source of polluting emissions within the meaning of Health and Safety Code section 41511.

Defendants cite to an analogous outcome in *People ex rel. Lungren v. Superior Court, supra*, 14 Cal.4th at pages 300–314. Defendants argue that the term "source" should include natural gas derived from liquefied natural gas which is part of plaintiff's pipeline system. In *Lungren*, our Supreme Court evaluated what constitutes a "source of drinking water" within the meaning of Health and Safety Code section 25249.5. Health and Safety Code section 25249.5 is part of the Safe Drinking Water and Toxic Enforcement Act of 1986. (Health & Saf. Code, §§ 25249.5–25249.13.) The issue, as posited by our Supreme Court, was as follows: "This case requires us to define what is meant by the phrase 'source of drinking water.' The Attorney General, who brought this action to enforce the Act, contends that the phrase includes the water that is stored in or run through water faucets, and so defendant faucet manufacturers, whose products allegedly leach toxic chemicals into drinking water, may be sued for violations of the Act. The faucet

manufacturers contend the contrary. [¶] We conclude that, in light of both the Act's language and its purpose, the Attorney General is correct in construing it to prohibit the discharge of toxic chemicals into faucet water." (*People ex rel. Lungren v. Superior Court, supra*, 14 Cal.4th at pp. 298–299.) When analyzing the issue in *Lungren*, our Supreme Court adverted in part to a dictionary definition of "source": "Another definition of 'source' is 'a point of origin or procurement.' (Webster's Third New Internat. Dict.[ (3d ed. 1961)] p. 2177.) Yet another possible meaning of 'source' is 'point of emanation,' as in 'it is desirable to have the light source accurately located.' (*Ibid.*) Faucets and faucet water can reasonably be understood to be a 'source' of drinking water in this sense, i.e., the point of procurement or emanation of drinking water." (*People ex rel. Lungren v. Superior Court, supra*, 14 Cal.4th at pp. 302–303.)

■ *Lungren*, which construes a different statute, is not dispositive. But its analysis is persuasive given the analogous circumstances and issues. Plaintiff is responsible for owning, importing and distributing gas derived from liquefied natural gas. There is evidence gas derived from liquefied natural gas will be the source of increased pollution which will have a harmful effect on the district's ambient air quality. Thus, when liberally construing the air quality statutes at issue, defendant acted reasonably in issuing Rule 433. Given the dispositive nature of our analysis, we need not address the parties' other contentions.

## VI. DISPOSITION

The judgment is affirmed. Defendants, South Coast Air Quality Management District and the Governing Board of the South Coast Air Quality Management District, shall recover their costs incurred on appeal from plaintiff, Southern California Gas Company.

Mosk, J., concurred.

**ARMSTRONG, J.,** Dissenting.—I respectfully dissent.

The majority has thoroughly described the complex background: the facts concerning liquefied natural gas, "regasification," and the pipeline; the role of the Public Utilities Commission and other regulators; the administrative proceedings and the proceedings in the trial court. I do not attempt to repeat that valiant effort. However, I draw a different conclusion from the facts and law.

When it adopted rule No. 433 (Rule 433), the South Coast Air Quality Management District (the District) relied on Health and Safety Code[1] section 41511, which provides that "For the purpose of carrying out the duties imposed upon . . . any district . . . the district . . . may adopt rules and regulations to require the owner or the operator of any air pollution emission source to take such action as . . . the district may determine to be reasonable for the determination of the amount of such emission from such source."

The appeal thus presents a single question, whether Southern California Gas Company (SoCalGas) is the owner or operator of an "air pollution emission source" under the statute.

SoCalGas argues that it is not, but that the owners and operators of gas burning equipment are the owners or operators of the source. The District's position is that natural gas itself, even when it is contained in the pipeline, is a source. The trial court agreed with the District, finding that in the context of the statutory scheme, "source" means "something that *leads to* a discharge into the air."

I think SoCalGas has the better argument, and that the trial court was wrong, as is the majority.

I begin by noting that I believe we should apply the ordinary rules of statutory construction, not the rules applicable to review of a quasi-legislative act. An agency's interpretation of a statute "does not implicate the exercise of a delegated lawmaking power; instead, it represents the agency's view of the statute's legal meaning and effect, questions lying within the constitutional domain of the courts." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) Thus, "A court does not . . . defer to an agency's view when deciding whether a regulation lies within the scope of the authority delegated by the Legislature. The court, not the agency, has 'final responsibility for the interpretation of the law' under which the regulation was issued. [Citations.]" (*Id.* at p. 11, fn. 4; see *Security National Guaranty, Inc. v. California Coastal Com.* (2008) 159 Cal.App.4th 402, 414 [71 Cal.Rptr.3d 522].)

The ordinary rules of statutory interpretation direct me to ascertain the intent of the Legislature by looking to the language of the statute itself, using the usual, ordinary meanings of the words, in the context of the statute and the statutory scheme. If " 'the language is clear and there is no uncertainty as to the legislative intent, we look no further and simply enforce the statute according to its terms.' " (*Phelps v. Stostad* (1997) 16 Cal.4th 23, 32 [65

---

[1] All further statutory references in this dissent are to the Health and Safety Code.

Cal.Rptr.2d 360, 939 P.2d 760].) In my view, this is a case in which the meaning of the statute can be ascertained from the statute.

Section 41511 permits the District to make regulations which compel the owner or operator of an air pollution emission source to determine "the amount of such emission from such source." The statute thus says that a "source" is something which actually releases emissions, not something which, as the majority writes, is a "potential pollutant source," or which, as the trial court found, can "lead to" emissions when additional forces, such as combustion, come into play.

Further, the regulation may be imposed only on "the owner or the operator" of this emitting source. The natural reading of that phrase leads me to conclude, again, that SoCalGas is correct that regulations may be imposed on the entity which owns or operates the equipment which burns the gas, but not on the entity which owns the gas in the pipeline.[2] A boiler is "operated," and the operation produces emissions. Gas in the closed container of the pipeline does not produce emissions. Under no plain English reading of the facts can SoCalGas be said to "operate" the gas in the pipeline.

On appeal, the District (and the other air districts in their amicus curiae brief) does seek to justify Rule 433 by arguing that the pipeline itself releases some emissions, which the parties term "fugitive emissions." However, the administrative record, which is replete with information about the combustion of higher Wobbe Index natural gas and the effect of higher Wobbe Index natural gas on combustion equipment, is devoid of any information about fugitive emissions. Nor does the District seem to have announced any concern about fugitive emissions in the rulemaking process. Instead, Rule 433 is intended to collect information about the emissions created by the combustion of natural gas, by SoCalGas's customers. The District's focus was and is on the effects of combustion, not on the gas itself.

The rest of the statutory scheme is in accord with my reading of section 41511.

The statutory scheme gives the District responsibility concerning air pollution from nonvehicular sources (§§ 40000, 40410), and "nonvehicular sources" is defined. It means "all sources of air contaminants, including the loading of fuels into vehicles, except vehicular sources." (§ 39043.) "Air

---

[2] Indeed, the record reflects that at any given time, SoCalGas only owns about 40 percent of the gas in its pipeline. As SoCalGas argues, section 41511 only allows the District to make an owner or operator of a source of emissions report on emissions *from that source*. Yet, Rule 433 requires SoCalGas to report on all the gas in the system and to estimate emissions throughout the South Coast Air Basin.

contaminant" is also defined. It means "any *discharge, release, or other propagation into the atmosphere* and includes, but is not limited to, smoke, charred paper, dust, soot, grime, carbon, fumes, gases, odors, particulate matter, acids, or any combination thereof." (§ 39013, italics added.)

Section 41510 gives air pollution control officers a right of entry to premises "on which an air pollution emission source is located for the purpose of inspecting such source, including securing samples of emissions therefrom."

These statutes tell us that a nonvehicular source is something that discharges or releases emissions (which can be sampled) into the air. Fuel in a closed container is not a "source," and does not become one until it is out of the container (through loading into vehicles), when contaminants are released into the atmosphere.

Further, other statutes which authorize regulation are not limited to owners or operators of sources, telling us that section 41511's limits are meaningful. For instance, section 41712, which authorizes the state board to regulate consumer products such as cleaning compounds and floor finishes, does not speak to "sources," but instead provides that "The state board shall adopt regulations to achieve the maximum feasible reduction in volatile organic compounds emitted by consumer products . . . ." Section 40506.1 speaks to permits for "an article, machine, equipment, or contrivance which may cause the issuance of air contaminants." (See also §§ 40515 [permits for water treatment devices which emit toxic air contaminants], 40724.5 [regulation of "agricultural practices"].) The language of section 41511 is markedly different.

It is true that, as the majority writes, civil statutes for the protection of the public must be broadly construed in favor of that protective purpose (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 313 [58 Cal.Rptr.2d 855, 926 P.2d 1042]), and that "[t]he statutes that provide the [air pollution control] districts with regulatory authority serve a public purpose of the highest order—protection of the public health." (*Western Oil & Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 419 [261 Cal.Rptr. 384, 777 P.2d 157].)

It is also true that, as the District argues, it has broad duties to adopt and enforce rules and regulations to achieve and maintain state and federal ambient air quality standards (§§ 40001, subd. (a), 40402, subds. (e) & (g), 40406) and in so doing to "consider the full spectrum of emission sources" (§§ 40440, subd. (a), 40402, subd. (e), 40460, 40463). And I accept the District's representation that Rule 433 will assist it in carrying out these

duties, and that obtaining information from SoCalGas, rather than from the end-users who burn the gas, is a far more practical and efficient way of obtaining the information it needs.

None of that changes the fact that section 41511, on which the District relied, allows regulations to be imposed only on "owners and operators of air pollution emission sources," and only as to the sources they own or operate. No amount of broad construction can contradict the plain language of the statute.

A petition for a rehearing was denied November 22, 2011, and on November 15, 2011, and November 22, 2011, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied January 18, 2012, S198406.